DUBOIS *vs.* KELLY and others.

The policy which has created exceptions to the general rule, that what-
ever is affixed to the freehold can not be removed without the consent
of the owner of the inheritance, applies as well to erections for agricultural
and other purposes, as to erections for the purposes of trade.

To constitute a fixture, there must be such an annexation as to render removal
impossible, without injury to the freehold.

Any general rule as to what constitutes a fixture, is liable to exception. But
the first question must be, whether the erection be a part of the freehold.
If it be not united to the freehold, it can not be said that it is a part of it;
and in that case, therefore, it is not a fixture.

And, the annexation which will convert personal into real estate, is not affected
by placing the chattel upon, or even by affixing it to the land. It must be
fixed to the freehold, *perpetui usus causa.*

An agreement by a landlord, that any buildings which the lessee, or any of
his under-tenants, may erect upon the demised premises, may be removed,
although such license be by *parol,* is not void within the statute of frauds.

The statute of frauds has no application to such a case, for such a license is
not intended to secure any interest in the land. It no more grants an
interest in the land, than if the owner granted to the tenant permission to
cut and remove a tree.

To render a parol agreement, or license respecting land void within the statute
of frauds, it must allow erections for a permanent purpose, such as would
be the transfer of an interest in the land.

A license, while executory, is revocable; but a conveyance by the owner,
after a license granted—the lessee of the premises being in possession at
the time of the conveyance, and not chargeable with notice of it—is not
a revocation.

But the *grantee* of such a conveyance, is chargeable where he takes the con-
veyance, with notice of all the tenant's rights, among which is the right to
remove any building which he, or his under tenant, might, before the
license, which had been given for that purpose, should be revoked, have
erected upon the premises.

The tenant, until he has notice of such revocation, may safely act upon the
license, and having erected the building, the license will be no longer
revocable.

The general doctrine that a transfer of the title to land upon which the former
owner has authorized some act to be done, operates as a revocation of the

Dubois *v.* Kelly.

license, is unquestionable. But, to render any revocation effectual, the party to be affected by it must have notice, either actual or constructive, of such revocation. If directly countermanded, it can only be done by some act which will be sufficient to charge the party to whom the license has been given, with knowledge of such countermand. If revoked by operation of law, as by a conveyance of the premises upon which the act authorized to be done was to have been performed, such revocation can only be effectual when the party claiming the benefit of the license is chargeable with notice of the conveyance.

If the grantee under the conveyance, by silence while the building is being erected, acquiesce in the license under which the tenant expends his money, it will be too late to insist upon a revocation, effected by operation of law, of which the tenant had no notice.

A tenant making improvements, which by the agreement he has the right to remove, may make such removal after his term expires, while he still remains in possession of the premises.

And, the right of removal not having been, in such case, abandoned by the tenant, the landlord can not maintain an action for the removal.

The rule, that if a fixture is not removed during the term, and the tenant quits the premises, and the landlord subsequently takes possession, the fixture becomes a part of the freehold, and the party, who was tenant, can not legally take it away afterwards—seems to have its foundation in the presumption of abandonment, arising from the conduct of the tenant, where he quits the premises, leaving his fixtures behind him. This presumption can never arise while the tenant remains in possession.

The law, accommodating itself to the changed condition of society, has so far relaxed the ancient rule, in conformity with the obvious justice of the case, as to allow the tenant, when leaving the premises, to take with him such erections as he may have had occasion to make for his own use or enjoyment, if he can do so without injury to the inheritance.

If there be no positive agreement expressed, that this may be done, the law will imply such an agreement.

The law of fixtures is in derogation of the original rule of the common law, which subjected every thing affixed to the freehold to the law governing the freehold; and it has grown up into a system of judicial legislation, so as almost to render the right of removal of fixtures a general rule, instead of being an exception.

*It seems,* that the common law of England is not to be taken in all respects to be that of America. The colonists brought with them and adopted only that portion which was applicable to their situation; and its general principles.

THIS was an action on the case, tried at the Ulster circuit, in April, 1849, before Mr. Justice Harris. The declaration stated that the plaintiff, being the owner of the reversion of

certain premises, situate in the town of Marlborough, of which one Sylvia Ann Mapes was in the possession and occupation, *as the plaintiff's tenant*, the defendants wrongfully, and without the license of the plaintiff, pulled down a shed, stable, store-room and barn, standing and being upon the premises, and took and carried away the materials thereof, and converted the same to their own use, whereby the plaintiff was injured in her reversionary estate. The defendants pleaded the general issue.

Upon the trial, it appeared that, in 1828, Lewis Dubois was the owner of the premises, and leased them to Miles J. Fletcher for twenty years. Fletcher testified that he occupied a part of the premises until the lease expired, and a part he underlet—first to one Wygant, and afterwards to Robert B. Mapes; that when he was about letting to Wygant, he asked Dubois, in the presence of Wygant, *if any building which should be put on might be taken off*—to which Dubois replied, that they might take it off—that he might take off any building he put on This was the same year the lease was executed. Wygant took a lease from Fletcher for the whole of his term; he erected a wagon-maker's shop upon the lot, and afterwards removed it. After occupying the lot four or five years, he transferred his lease to Mapes, who surrendered it and took a new lease from Fletcher for the residue of the term. The barn and shed, torn down by the defendants, were erected by Mapes shortly after he took the lot. Fletcher also erected a building upon his part of the lot, which he removed before his lease expired. On the 29th of June, 1829, Dubois and his wife conveyed the premises to Augustus H. Conklin, and, at the same time, Conklin re-conveyed to Mrs. Dubois, the plaintiff. A witness testified that the building removed was a wooden frame building, on a side hill, with a basement; the foundation, at the ends was a high stone wall, laid in mortar; the front of the basement was frame work; the frame work of the building extended down into the basement; the building could not have been removed without being taken down. The building was taken down on the 31st of March, 1848, the term of the lease having expired on the first day of the same month. Mrs. Mapes, the widow of Robert

Dubois *v.* Kelly.

B. Mapes, was in possession of the premises at the time, and had been in possession before the lease expired. Her husband had died about a year before the lease expired, and she continued to occupy the premises after his death. She employed the defendants to take down the building.

The court decided that the license to remove the buildings erected upon the premises, although by parol, would be good, and was not void, within the statute of frauds, as relating to real estate; that it was not revoked or annulled by the subsequent conveyance of the land to the plaintiff, but was just as binding upon the plaintiff, as it was upon Lewis Dubois, as respects the building in question: although the building was erected after the conveyance, and although it was not shown that the plaintiff ever had any notice of such license; also, that it made no difference that the building was removed after the expiration of the lease; that Mrs. Mapes having held over, and being in possession at the time of the removal, the right of removal continued; also, that Mrs. Mapes, having continued in possession after the death of her husband, had the same right to remove the building that her husband would have had, if he had lived and continued in possession. To these several decisions the plaintiff's counsel excepted.

The court then submitted it to the jury, to decide whether the license given by Dubois to remove the buildings, as proved by Fletcher, was a particular license to remove such buildings as Fletcher or Wygant might erect, or whether it was a general license to remove any buildings which might be erected by Fletcher, or any of his under tenants; and instructed them to find their verdict for the defendant, if they should come to the latter conclusion. To this charge the counsel for the plaintiff excepted. The jury rendered a verdict for the defendants. The plaintiff moved for a new trial, upon a bill of exceptions.

*G. G. Reynolds* for the plaintiff.

*J. K. Porter* for the defendant.

*By the Court*, HARRIS, J. Since the trial of this cause, I have had occasion, in the consideration of the case of *King* v. *Wilcomb*, (7 *Barb. S. C. Rep.* 263,) to examine, with much care, the law relating to the right of a tenant to remove fixtures erected by him for his own use and enjoyment, while occupying the premises under his tenancy. The conclusion at which I then arrived was, that a tenant who makes additions to the freehold, or improvements upon it, for the better use or enjoyment of the land, while his interest continues, has the right to remove such additions and improvements at any time before his right of enjoyment expires ; where such removal would not operate to the prejudice of the inheritance, by leaving it in a worse condition than when the tenant took possession.

The very learned argument of the plaintiff's counsel made me willing to review the grounds which had led me to that conclusion. That review has resulted in a stronger conviction that I had not misapprehended the present rule of law on the subject. The position which the plaintiff's counsel advocates, is, that fixtures, though attached to the freehold by the tenant, can not be removed, even during his term, unless by virtue of some valid agreement. He admits that erections for the purposes of trade may be removed, but insists that such erections constitute an exception, and the only exception, to the general rule. The case of *Elwes* v. *Maw*, (3 *East*, 38,) undoubtedly maintains the general doctrine for which the plaintiff's counsel contends. Lord Ellenborough, in that case, reviewed all the English decisions on the subject from the time of the Year Books, and although different judges had, at different periods in that country, entertained different opinions upon the question, down to the very time of that decision, he came to the conclusion that there was a distinction between annexations to the freehold for the purposes of trade and those made for agricultural purposes ; that, while the tenant, in the one case, had the right to remove what he had annexed, in the other, the annexation having been made, became a part of the realty, and could never afterwards be severed by the tenant.

This distinction, although it may not have been in any single

Dubois *v.* Kelly.

instance broken down by any adjudged case, has not, I am persuaded, been regarded with much favor in this country, if, indeed, it has in England. The foundation upon which it rests, is narrow and artificial. The general policy which has created exceptions to the general rule, that whatever is affixed to the freehold can not be removed without the consent of the owner of the inheritance, applies as well to erections for agricultural and other purposes, as to erections for the purposes of trade.

Mr. Justice Story, referring to the distinction taken by Lord Ellenborough, has eloquently said : "The common law of England is not to be taken in all respects to be that of America. Our ancestors brought with them its general principles, and claimed it as their birth right, but they brought with them and adopted, only that portion which was applicable to their situation. As between landlord and tenant, it is not so clear that the rigid rule of the common law, at least as it is expounded in 3 *East*, 38, was so applicable to their situation as to give rise to necessary presumption in its favor. The country was a wilderness, and the universal policy was to procure its cultivation and improvement. The owner of the soil, as well as the public, had every motive to encourage the tenant to devote himself to agriculture, and to favor any erections which should aid this result. In the comparative poverty of the country, what tenant could afford to erect fixtures of much expense or value, if he was to lose his whole interest therein by the very act of erection? His cabin, or log hut, however necessary for the improvement of the soil, would cease to be his the moment it was finished. It might, therefore, deserve consideration, whether, in case the doctrine were not previously adopted in a state, by some authoritative practice or adjudication, it ought to be assumed by this court as a part of the jurisprudence of such state, upon the mere footing of its existence in the common law." (*Van Ness* v. *Pacard*, 2 *Peters*, 137, 144.)

In the case just cited, the court held that the building there in question was within the exception in favor of erections for the purposes of trade, and for that purpose went to the extent

of holding that a two story house, resting upon a stone foundation, and having a stone cellar and a brick chimney, which had been erected by the tenant for the double purpose of a residence for his family, and carrying on the business of a dairyman, might be removed during the term.

In *Holmes* v. *Tremper*, (20 *John.* 29,) a tenant for years had removed a cider mill and press, which he had erected upon the demised premises. The landlord brought replevin. The tenant in her avowry justified the taking, because, at her own expense, and for her own use, she had built the mill and press, and, at the expiration of the tenancy, when removing from the premises, she had removed the mill and press also. The landlord pleaded that the mill and press were, at the time of taking, "*erected and standing upon and annexed to and parcel of the farm.*" To this plea there was a demurrer. Spencer, Ch. J. in delivering the opinion of the court said : "It is admitted that the defendant erected the cider mill and press, at her own cost, during her tenancy, for the purpose of making the cider on the farm. I confess, I never could perceive the reason, justice, or equity of the old cases, which gave to the landlord such kind of erections *as were merely for the use and convenience* of the tenant, the removal of which neither defrauds, nor does the least injury to the landlord. The rule anciently was very rigid, but I think it has yielded materially to the more just and liberal notions of modern times." Again, referring to the case of *Elwes* v. *Maw*, he says, "This case does not call for any expression of an opinion on the correctness of that decision, nor do we intend to approve or disapprove of it." It was held that the tenant had a right, within the principle laid down by Lord Ellenborough, to remove the mill and press, on the ground, that they were accessary to *the trade of making cider.*

In *Whiting* v. *Brastow*, (4 *Pick.* 310.) the supreme court of Massachusetts stated the rule to be, that, " a tenant for life, years, or at will, may at the expiration of his estate remove from the freehold all such improvements as were erected or placed there by him, the removal of which will not injure the premises, or put them in a worse plight than they were in when he took possession."

Dubois *v.* Kelly.

In speaking of this subject, Chancellor Kent, in his commentaries, (2 *Kent*, 343,) says : " as between landlord and tenant, many things are now treated as personal property, which seem, in a very considerable degree, to be attached to the freehold. The law of fixtures is in derogation of the original rule of the common law, which subjected every thing affixed to the freehold to the law governing the freehold, and it has grown up into a system of judicial legislation, so as almost to render the right of removal of fixtures a general rule, instead of being an exception." Again, the same learned writer says, (*page* 344, *note f.*) " The law of fixtures, in its application to the relation of landlord and tenant, partakes of the liberal and commercial spirit of the times."

Assuming that the building now in question was so annexed to the freehold as to render it a fixture within the legal meaning of the term, it is not by any means, clear that it is not removable by the tenant even within the rule as stated in *Elwes* v. *Maw*. What the object of erecting this building was, or to what purpose it had been devoted, does not distinctly appear. It is described in the declaration as " *a shed, stable, store-room and barn.*" It was in the village of Marlborough, adjoining Mapes' tavern. As it was erected by Mapes, a tavern keeper, upon a lot adjoining his own, it may perhaps be inferred that it was used as a barn, shed, stable and store room in connection with the tavern. If that be so, I do not perceive why it is not to be regarded as an erection for the purposes of trade, quite as much as the dairy house in *Van Ness* v. *Pacard*, or the cider press in *Holmes* v. *Tremper*, both of which cases were considered by the very eminent jurists by whom they were decided, as harmonizing with the principle contained in *Elwes* v. *Maw*. In *Dean* v. *Allalley*, (3ʳ *Esp.* 11,) two sheds, called Dutch barns, which, in *Elwes* v. *Maw*, Lord Ellenborough says, he will assume were unquestionably fixtures, had been removed by the tenant. Lord Kenyon, before whom the case was tried at *nisi prius*, said, "the law will make the most favorable construction for the tenant, where he has made necessary and useful erections for the benefit of his trade or manufacture, and

which will enable him to carry it on with more advantage. It has been so holden in the case of cider-mills, and in other cases; and I shall not narrow the law, but hold erections of this sort, *made for the benefit of trade*, or constructed as the present, to be removable at the end of the term."

The question before the court in *Elwes* v. *Maw*, as stated by Lord Ellenborough himself, was, whether "a tenant for mere agricultural purposes, had the right to remove buildings fixed to the freehold, which were constructed by him for the ordinary purposes of husbandry and connected with no description of trade whatsoever." To that description of buildings he adds " no case has yet extended the indulgence allowed to tenants, in respect to buildings for the purposes of trade." Thus it appears, that, in the view of Lord Ellenborough, the Dutch barns in *Dean* v. *Allalley*, although it is no where stated for what particular purpose they had been erected, were to be regarded as within the exception in favor of erections for the purposes of trade. And if the Dutch barns, in *Dean* v. *Allalley*, might be removed, within the principle established in *Elwes* v. *Maw*, why not the barn erected by Mapes?

But was the building, for the removal of which this action is brought, so annexed to the realty as to make it a *fixture?* The attempt of legal writers to distinguish between erections which are, and those which are not fixtures, has not always been quite successful. And judges seem sometimes to have referred the particular erection immediately in question, to one or the other class, as would best subserve their own notions of justice. Grady says (*Law of Fixtures*, 2, 3,) " The article must be *fixed in or to the ground,* or some substance already become a portion of the freehold, in order to deprive it of its personal nature." Thus in *Elwes* v. *Maw*, the buildings were of brick and mortar, and tiled, and *let into the ground.* Again, the same writer says, " the merely *laying and resting* buildings upon the earth, without *letting and imbedding* them into it, will not confer upon them the right to become fixtures." (*Grady's Law of Fixtures*, 2.) In *Walker* v. *Sherman*, (20 *Wend.* 636,) Cowen, J. from a most diffuse examination of cases, collects the fol-

lowing general rule. "That nothing of a nature personal in itself will pass, [with a conveyance of the freehold,] unless it be brought within the denomination of a fixture, by being in some way permanently, at least habitually, attached to the land or some building upon it." But the most perfect rule by which to determine whether a thing has acquired the attributes of a fixture is, in my judgment, that adopted by the supreme court of Connecticut, in *Swift* v. *Thompson*, (9 *Conn. Rep.* 63,) where it was held that to constitute a fixture *there must be such an annexation as to render removal impossible, without injury to the freehold.*

A reference to some of the decisions involving this question, will aid in determining whether the building, in the case in hand, was, in fact, a fixture or not.

In *Rex* v. *Otley*, (1 *Barn & Ad.* 161,) it was held that a wooden mill, built upon a brick foundation, upon which it rested by its own weight, was not a part of the freehold. In *Wansbrough* v. *Maton*, (4 *Ad. & Ellis*, 884,) a wooden barn had been erected on a foundation of brick and stone. The foundation was let into the ground, but the wood work rested upon the foundation by its weight alone. The tenant, by whom the barn had been erected, having left the premises at the expiration of his term, the barn still standing thereon, afterwards sent men to take it away. The defendant ordered the men to leave the ground, and locked the gates after them. The plaintiff having brought an action of trover for the barn, and these facts appearing upon the trial, the defendant moved for a nonsuit, on the ground that the barn was a fixture for which trover would not lie. The nonsuit was refused, with liberty to move, &c. Upon the argument of the motion, Lord Denman said: "Questions as to fixtures generally arise between the prima facie right of the landlord on the one hand, and exceptions in favor of trade *or of tenants*, on the other. Any general rule is liable to exception. But the first question must be, whether the erection be a part of the freehold. If it be not united to the freehold, we can not say that it is a part of it; and here it is not so united, and therefore not a fixture. Were we to hold otherwise, we should

Dubois *v.* Kelly.

over rule the decision in *Rex.* v. *Otley,* where such a building was held to be removable, and no part of the tenement." Littledale, J. said; "the barn consists of nothing but the timber, and is not attached to the stone or brick work. Perhaps the tenant might not have been entitled to dig into the ground for the purpose of making these foundations, and might be liable in damages for so doing. But, having so done, he places the barn on the stone caps, not fixing any thing to the freehold. Therefore, in removing the barn, he does not disturb the freehold." " The foundation must remain : If that be injured, the landlord may maintain an action." See also *Wood* v. *Hewett,* (8 *Adolp. & Ellis, N. S.* 913.)

In *Cook* v. *The Champlain Transportation Company,* (1 *Denio,* 91,) it was held that machinery and engines, though firmly affixed to the building, having been so affixed by tenants for the purpose of carrying on business of a personal nature, were still the personal property of the tenants, and, as such, were removable at their will. See also, *Farrar* v. *Chauffetete,* (5 *Denio,* 527 ;) *Leland* v. *Gassett,* (17 *Verm.* 403.) " The annexation which will convert personal into real estate, is not effected by placing the chattel upon or even by affixing it to the land. It must be fixed to the freehold *perpetui usus causa.*" Per Gardiner, J. in *Mott* v. *Palmer,* (1 *Comst.* 578.)

Now, if the mill in *Rex.* v. *Otley,* built as it was upon a brick foundation, and the barn in *Wansbrough* v. *Maton,* erected on a foundation of brick and stone let into the ground, and the machinery in *Cook* v. *The Champlain Transportation Company,* firmly affixed to the building, were not fixtures, but remained the personal property of the tenants by whom the erections were made, I am unable to see why the barn in this case, resting as it did upon a stone foundation, might not also have been treated as the personal property of the tenant. It was removed without injuring, or, for aught that appears, so much as displacing a particle of the realty. It is not pretended that the plaintiff suffered any injury from the removal, except by being deprived of the subsequent use of the thing removed. Upon these facts I think the judge at the circuit would have

been justified in instructing the jury,.as matter of law, that the defendants were entitled to a verdict.

But let it be assumed once more, as it was upon the trial, that the building was a fixture, and that it could only be removed by virtue of some agreement, valid as against the plaintiff. Was such an agreement established upon the trial? The verdict of the jury has established the fact that the plaintiff's husband, before the conveyance under which she claims title was executed, agreed that any buildings which Fletcher, his lessee, or any of his under-tenants, might erect upon the demised premises might be removed. But this license was by parol, and, therefore, the plaintiff contends, void within the statute of frauds. I think, however, the statute has no application to such a case. The very authorities cited in support of this position show, it seems to me, that a license, like that established in this case, is not void. " A license," says Kent, (3 *Kent's Comm.* 452,) "is an authority to do a particular act, or series of acts, upon another's land, without possessing any estate therein. It is founded in personal confidence, and is not assignable, nor within the statute of frauds." In *Mumford* v. *Whitney*, (15 *Wend.* 380,) the only other authority cited by the plaintiff upon this point, it was held that a license to enter upon land and erect a dam for a *temporary* purpose, though by parol, is valid, but that a parol agreement to allow a party to enter and erect a dam for a *permanent* purpose is void within the statute of frauds, it being the *transfer* of an interest in the land. Here the license was not intended to secure any interest in the land. It did not authorize the erection of the building. This the tenant might do, under authority of the lease. All that the license secured to the tenant, and all that was intended by it was, that, having erected the building, he might enter upon the land and remove it. This particular act was all that the license contemplated. It no more granted an interest in the land than it would have done if the owner had granted to the tenant permission to cut and remove a tree.

But it is said, that though the license, unrevoked, may have been valid, it was, in fact, revoked by the deed executed by

the lessor in 1829. . It is true that a license, while executory, is revocable. The building was erected after the conveyance. If, therefore the conveyance operated as a revocation of the license, the license so revoked will not justify the removal. If, as appeared upon the trial, the plaintiff was the wife of the lessor, then the conveyance only operated to change the line of inheritance. The grantor, as tenant by the curtesy, still retained a life estate in the premises, which, upon his death, instead of descending to his heirs, would go to his wife and her heirs. Upon this state of facts, it could hardly be pretended that the conveyance operated as a revocation of the license ; certainly not before the death of Lewis Dubois, and there is no evidence that he is even yet dead. But, as the fact that the plaintiff was the wife of Lewis Dubois is omitted in the bill of exceptions, let it be assumed that she was, at the time of the conveyance, a *feme sole*, and acquired a present title to the premises. The lessee of the premises being in possession at the time of the conveyance, was not chargeable with notice of such conveyance ; while, on the other hand, the plaintiff was chargeable when she took the conveyance, with notice of all the tenant's rights, among which was the right to remove any building which he, or his under-tenants, might, before the license which had been given for that purpose should be revoked, erect upon the premises. Until the tenant had notice of such revocation, he might safely act upon the license, and having erected the building, the license was no longer revocable. I think, therefore, upon the facts as they are presented in the bill of exceptions, the license to remove the building was not revoked, by the conveyance to the plaintiff. (*See Brice* v. *Brice,* 5 *Barb. Sup. C. Rep.* 548, *and cases there cited.*)

The general doctrine, found in the cases cited by the plaintiff's counsel, that a transfer of the title to land upon which the former owner has authorized some act to be done, operates as a revocation of the license, is unquestionable. (*Mumford* v. *Whitney,* 15 *Wend.* 386. *Miller* v. *The Auburn & Syracuse Railroad Company,* 6 *Hill,* 64.) But to render any revocation effectual, the party to be affected by it must have notice, either actual or constructive, of such revocation. If directly counter-

Dubois *v.* Kelly.

manded, it can only be done by some act which will be sufficient to charge the party to whom the license had been given, with knowledge of such countermand. If revoked by operation of law as by a conveyance of the premises upon which the act authorized to be done was to have been performed, such revocation can only be effectual when the party claiming the benefit of the license, is chargeable with notice of the conveyance. Here it does not appear that Fletcher or his under-tenants had such notice. The tenant having been encouraged by the license to expend money in the erection of the building without notice of the conveyance, can not now, in good conscience, be deprived of the beneficial privilege upon which he relied. The plaintiff, by her silence when the building was erected, acquiesced in the license under which the tenant expended his money, and it is now too late for her to insist upon a revocation effected by operation of law, of which the tenant had no notice.

The next question is, whether the right of removal had expired when the removal took place. The term expressed in the lease ended on the first of March. It does not appear that there was a new agreement. The tenant must therefore be regarded as holding over. The question is therefore presented, whether a tenant, making improvements, which, by agreement, he has the right to remove, may make such removal after his term expires ?

The general rule on the subject, as laid down by *Amos & Ferard,* is that the tenant must avail himself of his privilege to remove fixtures, *during the continuance* of his term, for if he forbear to do it within this period, the law presumes that he voluntarily relinquishes his claim in favor of his landlord. (*Amos & Ferard on Fixtures,* 87.) In *Lyde* v. *Russell,* (1 *Barn & Ad.* 394,) the tenant at his own expense provided and hung bells in the house. Having quitted the house, without removing the bells, it was held that though he might have removed them *during the term,* they vested in the landlord on the *determination of the term.* In *Weeton* v. *Woodcock,* (7 *Mess. & W.* 14,) the lease contained a proviso that it should be void upon the bankruptcy of the tenant. It was held that the assignees could not remove

a trade fixture erected by the tenant, after a reasonable time for that purpose had expired. Alderson, B. said, " The rule to be collected from the several cases decided on this subject, seems to be this, that the tenant's right to remove fixtures continues *during his original term*, and during such further period of possession by him, as he holds the premises under a right still to consider himself as tenant." The precise question now under consideration, was before the court in *Penton* v. *Robart*, (2 *East*, 88,) where it was decided that a tenant who had remained in possession after the expiration of his term, had a right to take away fixtures, which he might have removed during his term. Lord Kenyon says ; " He was in fact still in possession of the premises at the time when the things were taken away, *and therefore there is no pretense to say that he had abandoned* them." *Gaffield* v. *Hapgood*, (17 *Pick.* 192,) was an action of trover to recover the value of a fire-frame which a tenant had left upon the premises. The court held that the fire-frame was a fixture, and said : " If the fixtures should not be removed during the term, and the tenant should quit, and the landlord take possession afterwards, the law is very clear, that the fixture becomes a part of the freehold, and that the party who was tenant can not legally take it away afterwards." See also *Holmes* v. *Tremper*, above cited. The rule on the subject seems to have its foundation in the presumption of abandonment arising from the conduct of the tenant. When he quits the premises, leaving his fixtures behind him, it may well be presumed that he intended to abandon them. In the language of Lord Holt, " they become a gift in law to him in reversion, and are not removable." (*Poole's case*, 1 *Salk.* 368.) This presumption can never arise while the tenant remains in possession. Accordingly, in *Penton* v. *Robart*, the landlord had actually recovered judgment in ejectment against the tenant, but as the judgment had not been executed, Lord Kenyon thought the right to remove fixtures continued.

The right of removal, then, not having been abandoned by the tenant, the landlord could not maintain an action for the removal, even though it had been wrongful. It was an injury to the

Dubois *v.* Kelly.

tenant, not the landlord. If Mrs. Mapes had not the right to take down the building, she was answerable to the legal representatives of her husband, not to the plaintiff. But, at least as against the plaintiff, I think she had the right of removal. She was in possession of the premises. Such possession was *prima facie* evidence that she was assignee of the lessee. So that she would have been chargeable with rent, as such assignee. If, therefore, as we have seen, the right to remove the building continued, when it was in fact removed, that right existed, as the facts appear in this case, in Mrs. Mapes, and no one else.

Upon the whole, I can not perceive that there was any error against the plaintiff upon the trial. The building was erected by the tenant for the more profitable and comfortable enjoyment of the premises during the tenancy. Neither the erection nor its removal, has at all invaded the rights of the owner of the freehold. The inheritance is as valuable to its owner, as it would have been if the building had never been erected. If the owner is injured, it is only by the want of what the tenant put there for himself and at his own expense, and not for his landlord. The law, accommodating itself to the changed condition of society, has so far relaxed the ancient rule, in conformity with the obvious justice of the case, as to allow the tenant when leaving the premises, to take with him such erections as he may have had occasion to make for his own use or enjoyment, if he can do so without injury to the inheritance. In this case, there was a positive agreement that this might be done. The law would have implied such an agreement, had none been expressed. The motion for a new trial should therefore be denied.

New trial denied.