# CHARLESTON.

## CHILDS v. HURD.

Submitted January 19, 1889. Decided February 11, 1889.

1. MORTGAGE—DEED—CORPORATIONS.

A mortgageor left in possession of the mortgaged premises is entitled to the rents, issues and profits of them without rendering an account of them to the mortgagee, who can never recover them from him. The mortgageor is regarded in equity as the real owner of the property, a court of equity regarding a mortgage as a mere security, and the mortgagee, though the legal title be in him, as having a chattel-interest. (p. 87.)

2. MORTGAGE—FORECLOSURE.

If therefore a suit to foreclose a mortgage whether of real or personal property be brought by the mortgagee, the mortgageor will continue pending the suit to take the rents and profits or use of the mortgaged property, unless the court by its order appoint a receiver, and he takes possession of it. Till the receiver takes actual possession of the mortgaged property, the mortgageor in possession takes the rents, issues and profits or has the use of the property as owner without rendering an account thereof. (p. 89.)

3. MORTGAGE—FORFEITURE.

But after forfeiture the mortgagee has a right to take possession

of the mortgaged property and hold the same without rendering an account of the rents, issues and profits other than applying them to the payment of the debt secured by the mortgage. (p. 90.)

4. MORTGAGE—FORECLOSURE.

If the suit brought by the mortgagee be not a simple suit to foreclose the mortgage, but it be brought also to require an agent of the mortgageor in possession and use of the mortgaged property to render an account and to have the rents and profits taken possession of and paid over to the parties entitled to them or having a lien or claim on them, such agent and all having any lien or claim to such rents will be regarded, as though he had been a receiver appointed by the court, and the rents, issues and profits of the mortgaged premises will be ordered to be paid into the court by him ; and the court will dispose of the same according to the rights of the parties ; and in such case the mortgagee will have a superior right to such rents, issues and profits to any creditor acquiring a lien on them subsequent to the institution of the suit. (p. 90.)

5. MORTGAGE—FORECLOSURE.

If in such suit the mortgaged premises is a lease of lands to the mortgageor for the purpose of mining coal or iron on the same during the continuance of the lease, and the lessor retains a certain amount on every ton of coal or iron mined as royalty with or without a provision in the lease, that no coal or iron shall be moved from the premises, till such royalty be paid, such landlord has a right to be paid before the mortgagee out of any funds in the hands of the agent of the mortgageor, arising out of the sale of coal or iron mined on the premises, and paid into court. (p. 117.)

6. MORTGAGE.

A railroad is built on such leased premises in order to facilitate the mining of such coal and iron ore. Such railroad passes to the mortgagee in a mortgage made by the lessor of such land ; and, if the proceeds of the sale of such iron of said railroad track come into the hands of the court in such suit, they will be directed to be paid to the mortgagee in preference to any lienor subsequent to the recording of such mortgages. (p. 112.)

7 MORTGAGE—FORECLOSURE—ATTACHMENT—PRIORITY.

In such a suit none of the defendants, creditors of the mortgageor, can gain any priority over other defendants by levying an attachment pending such suit on an agent of the mortgageor having such leased premises in his possession. (p. 91.)

8. DEED— CONSIDERATION — EVIDENCE — FRAUDULENT CONVEYANCE.

The recital in a deed, that the consideration was valuable and paid, is no evidence of such payment as against creditors of the grantor assailing such deed as voluntary and therefore fraudulent as to them. (p. 100.)

9. CORPORATIONS.

Where the statute law of a state requires, that, before a corporation can do any business, it shall record in a certain county the certificate of its incorporation, this is a condition precedent, and the corporation has no power to transact any business, till such condition is complied with, and such corporation has really no existence, till such certificate of incorporation is so recorded. (p. 99.)

10. LANDLORD AND TENANT—FIXTURES.

A tenant may remove fixtures, which he has put on leased premises, at any time during his lease, or while he continues tenant, but after the expiration of the lease and the surrender of the premises to the landlord he cannot enter on the premises and remove any fixtures, for when he quits the premises leaving his fixtures behind him, it will be presumed, he intended to abandon them. (p. 102.)

11. COMMISSIONER OF COURT—REPORT.

If a commissioner fails entirely to report with reference to any of the matter referred to him, the court should refer the matter to him again to be reported upon, and this should. be done, though no one except to such report. No one's right can be regarded as abandoned or prejudiced by his failure to except to such report. (p. 103.)

12. JUDGMENT—SALE—EXECUTION—RAILROAD.

When the iron on a railroad is sold under an execution as personal property, but the proceeds are brought into a court of equity to be disposed of to the proper parties, such proceeds should be paid by the order of the court to the owner of the lease not to the execution-creditor. (p. 115.)

*S. P. McCormick, C. Boggess* and *J. Bassel* for appellants.

*J. W. Mason* for Childs and Brown.

*F. Woods* for E. G. Jeffries.

Statement of the case by GREEN, JUDGE:

The record in this case is very large containing upwards of 400 printed pages. I will endeavor to give a concise statement of the material facts.

On January 2, 1878, Samuel Colgate of New Jersey leased to Charles S. Hurd of Taylor county about 2,000 acres of coal-land in Preston county, W. Va. The lease was for five years commencing May 1, 1878; and said Hurd agreed to pay ten cents *per* ton for all coal mined by him during this time on said land. The property was located on the Balti-

more & Ohio Railroad at Austen and was known as the "Austen Mines." These mines had already been worked; and the lease included all the works and property on the ground then used for mining coal, and the timber on said land necessary to keep the mines in proper condition, to be selected with the assent of M. L. Shaffer, when practicable. The royalty of ten cents *per* ton on all coal mined was to be paid quarterly; and thirty days after the end of each quarter the lessee, Hurd, was also to pay $250.00 rent *per annum* for a store-room. If any part of said rents and royalties were in arrears for thirty days, after the rent was due and demanded, the lessor, Colgate, was authorized to enter into and distrain upon said mines and premises or dispose of same in due course of law as landlord.

Hurd entered into the possession of the land under this lease at once and began to operate the mines extensively converting much of the coal mined into coke, which was consumed at Hurd's iron-furnaces at Ironton, Taylor county, W. Va.

Hurd became indebted to Edward F. Browning, and on May 15, 1879, he executed to Browning a mortgage on a claim, which he had against the Lancaster Furnace & Mining Company, secured by a deed of trust from said company to Krauss, trustee, dated December 22, 1874, and recorded in said Taylor county, W. Va., and on said deed of trust and on all his property, real, personal or mixed in Taylor county, which is described as all the property conveyed to said Hurd by Jacob Krauss by deed dated February 7, 1878, and duly recorded in said county of Taylor. This mortgage was in form an absolute deed and was duly recorded. The debt to Browning was by the court in this cause ascertained to be $4,773.29.

About three months afterwards, on August 13, 1879, Hurd executed to Joseph S. Brown and A. A. Childs a mortgage on the Austen mines and also a lease to certain property made to said Hurd by one Ulman at Ironton furnace in Taylor county and all the personal property of every nature and kind connected with said furnace or said coal-mines as security for the compliance by said Hurd with and fulfilment of a contract made by him with said Childs and

Brown, whereby they agreed to advance to said Hurd on account of iron delivered by him to them moneys not exceeding $12,000.00 in the manner following: During the month of August, $3,000.00; during September, $5,000.00; and during October (if the delivery of the iron should not have been completed) so much as C. S. Hurd may want; and by this contract said Hurd sold to Brown and Childs 1,000 tons of pig-iron, to be made as soon as possible at said furnace, at $15.00 per ton, to be delivered at Pittsburgh. The amount due on this mortgage for advances made by Childs and Brown with interest to November 4, 1885, afterwards turned out, as ascertained by the court, to be $2,353.67.

Some ten months afterwards, on June 10, 1880, Hurd executed a second mortgage on the Austen mines and also on the Waldorf furnace-property and also certain leases of iron-land in Taylor county, W. Va., made to said Hurd by one F. Leon Clerc. This mortgage was made to secure a note for $15,000.00, payable to said Childs ten days after the date of this mortgage. The amount of this debt secured by this mortgage, as afterwards ascertained by the court, was on November 4, 1885, $4,696.10, with interest from June 1, 1881, $1,246.81, or a total as of November 4, 1885, of $8,296.58.

On the 5th of February, 1881, a creditor of said Hurd, Thomas N. Jeffreys, issued an attachment in an action of *assumpsit* against him in the Circuit Court of Taylor county to satisfy a debt of $5,000.00, which attachment was levied on that day on the estate of said Hurd in the said Waldorf furnace-property, a list of which is given, including a locomotive engine. It was also levied on the Baltimore & Ohio Railroad Company as garnishees on the same day. Between the 5th and 10th of February, 1881, this attachment was levied on additional personal property of said Hurd; and on August 19, 1881, it was served on Martin L. Shaffer as garnishee. Martin L. Shaffer was said Hurd's agent in control and possession of said Austen mines from about January 15, 1881, till May 1, 1883, when the Colgate lease of said mines to said Hurd expired. A judgment was rendered against Hurd in said action on August 11, 1881, for $7,001.15 with interest from that date and $34.47 costs. This judgment became by

assignment the property of Eugene G. Jeffreys; and on November 16, 1887, amounted to $9,666.88. On January 1, 1881, said Hurd assigned to the Austen Coke Company, a New York corporation, said Colgate's lease of the Austen mines. This assignment was claimed to be fraudulent and void as to creditors of said Hurd and was so held by the court below.

While Martin L. Shaffer was in the possession of the Austen mines, there came into his hands from the sale of its products $6,743.11, which with $300.00 derived from the sale of certain mules by Hurd was paid into court on November 20, 1885. Albert H. Childs at June rules 1881 filed his bill in the Circuit Court of Taylor county to foreclose his said mortgage of June 10, 1880, on the Waldorf furnace property, the Austen mines property and said Clerc lease to Hurd. This bill also made the judgment-creditors of said Hurd defendants. These were set out in the bill:—one justice's judgment rendered March 7, 1881, and some fifty justice's judgments rendered March 12, 1881. On all these executions were promptly issued. There were also fourteen other judgments rendered by another justice of Taylor county during the months of February, March and April, 1881. On these judgments also executions were issued promptly. All of these judgment-creditors as well as Thomas N. Jeffreys, who had issued his attachment aforesaid on February 5, 1831, and also those creditors, who had obtained judgments at the March term, 1881, of the Circuit Court of Taylor county, were made defendants to this bill. Executions issued on the three last judgments on April 14, 1881. The bill concludes thus :

"Plaintiff thereupon charges and alleges, that his said mortgage is a lien upon said Ulman lease and personal property at and upon said furnace-premises third in priority, the said Browning's mortgage being first, and said Brown and plaintiff's mortgage being second ; that his said mortgage as to said Colgate lease is a lien second in priority, said Brown's and plaintiff's morrgage being first. Plaintiff therefore asks that said Ulman and Colgate leases and said personal property hereinbefore described be sold, and that his said claim be paid out of the proceeds arising therefrom; and he

asks such further and general relief as the court may see fit to grant."

All the defendants appeared to the bill, and filed a general demurrer thereto, which by its decree of August 11, 1888, the court overruled; "and by consent of all parties the cause was referred to a commissioner to ascertain and report all the property real and personal belonging to said Hurd in West Virginia together with the liens thereon and their respective priorities."

October 20, 1881, the commissioner reported that Charles S. Hurd owned no real estate in West Virginia: that he owned the following personal property in Preston county W. Va.; (1,) a certain leasehold interest on about 2,000 acres of land, being the leasehold interest granted to said Hurd by Samuel Colgate of New Jersey dated January 2, 1878. This has been hereinbefore fully described. The following the commissioner reports as the liens on said property according to their priorities: first in priority, mortgage to Allen H. Childs and Joseph S. Brown hereinbefore described amount due with interest to November 4, 1881, $13,349.85; second in priority, mortgage to Albert H. Childs, date June 16, 1880, duly recorded therein, heretofore particularly described, amount due with interest to November 4, 1881, $19,622.21. The commissioner reported, that in addition to this mortgage Albert H. Childs held as collateral security for this debt 750 tons of pig-iron, estimated at $19.00 or $20.00 per ton; and that after the execution of the two foregoing mortgages on the 15th day of January, 1881, the defendant Charles S. Hurd assigned said lease to the Austen Coke Company subject to this mortgage. The commissioner then reports in detail the personal property situated in Taylor county owned by said Hurd. It is property connected with Waldorf furnace property belonging to said Hurd. He states, that he ascertained what belonged to Hurd by taking all the furnace property, which had been levied on by an officer, and deducting from it all the personal property at this furnace, at the time said Charles S. Hurd took possession of it under his lease from Ulman, as shown by the deposition of Reuben Watte and Thomas N. Jeffreys, returned with the report. A portion of this

personal property had been sold by a constable under a distress-warrant for rent, bringing $844.00, which had all been paid out for taxes or rent and costs excepting $27.97, still in the constable's hands. This constable also sold under execution a bay horse, the property of the Lancaster Furnace & Mining Company, subject to a certain lien for $32.78. He paid for keeping the horse $7.60, and the balance, $25.15, he still has in his hands; and he has also $82.00 the proceeds of the sale of a horse belonging to said Hurd sold under execution; the total amount in his hands being $130.12.

The following is reported in reference to the property of the Lancaster Furnace & Mining Company: They are the owners of certain property at the Waldorf furnace at Ironton Taylor county, W. Va. The report gives a list of this personal property, two items of which the railroad iron on two and a half miles of railroad track, two steam-engines besides various other items of personal property specified. Of this personal property the sheriff of Taylor county under execution of George Heller against the Lancaster Furnace & Mining Company sold the railroad iron, one locomotive-engine, three carts, one wagon and one steam-engine for a saw-mill. These sales amounted to $1,707.14. These articles were all purchased by Mason, attorney for Heller, and by John S. Herr except certain articles purchased by others amounting to $132.14; and this sum as well as all balances of said purchase-money, amounting to $1,707.14 in all, was settled by the sheriff with Mason as attorney for Heller in said execution. There was a deed of trust on this property, which was the first lien on all the property of the Lancaster Furnace & Mining Company. It was a deed of trust to Krauss, trustee, to secure a debt of $15,000.00, which with interest to November 4, 1881, amounted to $20,417.50. This debt had been assigned to Charles S. Hurd on February 7, 1878, and was mortgaged by said Hurd to secure a debt to Edward F. Browning by mortgage dated and duly recorded May 1, 1879. The commissioner expresses the opinion, that said Hurd should be substituted to the trust-lien of Krauss on this property, and that Edward F. Browning, another lien creditor of said Hurd, should be substi-

tuted in place of said Hurd to the extent of the debt against said Hurd, as follows :

| | |
|---|---:|
| Amount of Browning's debt | $1,421 37 |
| Interest 14th February, 1880, to November 4, 1881 | 146 87 |
| | 1,786 34 |
| Interest 8th November, 1879, to November 4, 1881 | 213 15 |
| | $3,567 .73 |

Then followed forty six judgments against said Hurd aggregating in amount $20,417.50, in thirteen classes. After all these judgments and as the fourteenth in priority is the judgment in favor of George Heller, amounting with interest to November 4, 1881, and costs to $5,077.71. There is but one lien subsequent to this, and that is a judgment in favor of Samuel Carrothers amounting, debts, interest, and costs to November 4, 1881, to $319.17. This part of the report concludes thus :

" The following liens on said Lancaster Furnace & Mining Company's property are also liens upon the said Charles S. Hurd's personal property situated at Waldorf furnace, in Taylor county, as heretofore reported, except that said Edward F. Browning's lien reported first in priority is not a lien upon said Hurd's personal property ; said Hurd having mortgaged to said Browning only that property acquired by him [Hurd] through the Krauss deed of trust. This will make Thomas N. Jeffreys' attachment first in priority, and the other execution liens following in priority as they were heretofore reported, on the furnace property, except the liens of George Heller and Samuel Carrothers, reported fourteenth and fifteenth in priority, are not liens upon the personal property hereinbefore reported as belonging to C. S. Hurd."

The report then proceeds as follows :

"The Lancaster Furnace & Mining Company are the owners of a certain strip of land thirty feet wide, running through a tract of land on Three Forks, known as the 'Nichols Tract.' The following liens exist upon said land :

| | |
|---|---:|
| 'First in priority, George Heller, judgment debt, interest, and cost | $5,077 71 |
| 'Second in priority, Samuel Carrothers, judgment debt, interest, and cost | 319 17 |
| | '$5,386 88' |

" *Waldorf Furnace Case.* The said Charles S. Hurd having failed to comply with his agreement with Alfred J. Ulman in regard to the lease of the said furnace property, said lease was forfeited, and said Alfred J. Ulman has taken possession of said property."

This report was excepted to by Edward F. Browning and Thomas N. Jeffreys. The cause was on November 22, 1881, heard upon the report; and by consent of parties the court without acting on said exceptions recommitted said report to the commissioner for the purpose of restating the plaintiff's claim and amending the report in such other particulars, as may be deemed proper by him or required by any of the parties hereto. There were some directions given in this decree in reference to the mode of settling the accounts of Hurd and plaintiff, which I do not deem it necessary to set out; and by the same decree by consent of parties it was ordered, that John W. Mason and Samuel McCormick, special commissioners, do sell the said lease of the Austen mines made by Samuel Colgate to Charles S. Hurd, which is dated January 2, 1878,—the sale to be made for one-fourth in cash and the residue on a credit of four, eight and twelve months with interest from the day of sale; the purchasers executing bonds therefor with good personal security. And other usual and proper directions are given with reference to said sale in said decree.

John W. Mason, one of these special commissioners, sold this lease of land known as the "Austen Mines" in the manner stated in his report, Edward Austen being the purchaser, for $500.00. The sale report was excepted to by the Austen Coke Company for reasons set forth in a petition filed at the next term of the court, which asked the court to set aside this sale. But the motion was overruled; and the Austen Coke Company then offered for said property an upset bid of $5,500.00, in case the sale should be set aside and bidding reopened, securing the same by bond with approved security; and thereupon the court set aside the sale made to Edward Austen. From this decree the purchaser, Edward Austen, obtained an appeal and *supersedeas,* which was dismissed by this Court as improvidently allowed, before such re-sale had been made and confirmed. See *Childs* v. *Hurd,* 25 W. Va.

530. This decision was rendered April 4, 1885. In the meantime the said lease of the Austen mines by Colgate to Hurd expired, towit, in May, 1883, so that there remained nothing for the special commissioners of the court to sell.

On November 18, 1887, Eugene G. Jeffreys filed his cross-bill in this cause, in which he states, that on February 5, 1881, in said Circuit Court Thomas N. Jeffreys, a defendant in the original suit, commenced an action of *assumpsit* against said Hurd, accompanying it with an attachment for $5,000.00 and the costs of the suit; which attachment was issued and served on that day on Hurd's estate in said Austen mines.

The evidence of these levies was filed with the cross-bill, which stated, that in said action of *assumpsit* on August 11, 1881, Thomas N. Jeffreys recovered against said Hurd $7,-001.15 with interest from that day and $34.47, which judgment was transferred and assigned by him to the plaintiff in the cross-bill, Eugene G. Jeffreys. The cross-bill further alleges as follows: that on May 1, 1878, the defendant, Hurd, under said Colgate's lease took possession of the Austen mines and at once began to mine large amounts of coal therein and to convert much of it into coke; that he employed the defendant Martin L. Shaffer as his agent to carry on these mining and coking operations and put him in possession and control of said Austen mines property; that he continued as such agent to carry on these mining and coking operations till May 1, 1883, when said lease by Colgate of said property expired; that the royalty due said Colgate under said lease for the coal mines was regularly paid to him; that, when said Hurd put said Shaffer in possession of said Austen mines as superintendent, the said Hurd at once removed from this State and has ever since been a non-resident of this State; that as such agent and superintendent Shaffer received from said Austen mines property many thousand tons of coal, out of which, this cross-bill alleges, he manufactured and sold at least 35,393 tons of coke, and made a net profit of at least $11,915.17, after retaining all sums due from said Hurd as salary and as his debtor; of which net profit Shaffer expended without consent or authority of said Hurd $4,062.78 in building on the premises with the knowledge and consent of the landlord Colgate twenty new ov-

ens, which increased the value of said Austen mines property to the full extent of the cost of the ovens; and that Shaffer is indebted to said Hurd to the full extent of said net profits of the said mines, $11,915.17, with interest thereon from May 1, 1883, less the sum of $4,062.78, unlawfully and wrongfully expended in building said twenty coke-ovens.

This cross-bill further alleges, that in said original suit of *Childs* v. *Hurd* under a decree dated April 8, 1882, directing a re-sale of said lease of the Austen mines property it was offered for sale on July 27, 1885; but that McCormick and Armstrong, who had offered the upset bid of $5,500.00, wholly failed to bid on said property or pay for the same or take said property at any price, as it was then of no value, the said lease having then expired; and that the defendants McCormick and Armstrong were liable to pay into the court their said upset bid of $5,500.00 with interest thereon from July 27, 1885, and that this money is liable to be first applied to the plaintiff's claim, he having a lien thereon by virtue of the said attachment.

The cross-bill also alleges, that in the original cause of *Childs* v. *Hurd* an order was made directing Shaffer to pay to the general receiver of this court $7,043.11, which was the amount due from him to said Hurd as his agent and superintendent, excluding however the interest from May 1, 1883; that said Shaffer paid said sum to said receiver but still owes the interest on said sum from May 1, 1883.

In this cross-bill the plaintiff, Jeffreys, claims, that under the aforesaid two mortgages on Austen mines property no rights passed to the mortgagees either Childs or Brown, to change any part of their claims secured by the same mortgages on the rents and profits of the said Austen mines; that in the original suit they did not make this claim but sought only to subject the lease-property itself to sale; and that as to the rents and profits of said lease-property in the hands of Shaffer the said Childs and Brown by said mortgages had no lien upon the same, and that he Shaffer was simply indebted to Hurd individually therefor, and the plaintiff, Jeffreys, in this cross-bill acquired a lien on the same by his attachment served on Shaffer on August 15, 1881.

It is further alleged in this cross-bill, that said Hurd, when he

put said Shaffer in charge of these Austen mines as superintendent and as the agent of said Hurd in January, 1881, he, the said Hurd, was utterly insolvent and worthless, and that, this being his pecuniary condition, he changed his residence from West Virginia to New York, where he promptly associated himself with two other persons under the statute-law of that state and formed two distinct joint-stock corporations, these three persons being the only incorporators and trustees of both corporations, one called the "Alleghany Iron & Coke Company," and the other the "Austen Coke Company,"— both having their principal offices in the city of New York; that these companies were thus got up simply that all the property owned by the said Hurd including the Austen mines might be assigned to them said assignment being made with intent to hinder, delay and defraud the plaintiff in this cross-bill and other creditors of the said Hurd; that the certificates of the formation of both of these companies were made on the same day, January 14, 1881; that the acknowledgment of the agreement, the basis of each of these corporations, was made by these parties on the same day and before the same notary public, and on the next day they were both filed in the office of the clerk of the county of New York in the state of New York; but that no duplicate of either certificate was ever filed, as required by law, in the office of the comptroller of the treasury of New York; nor has either of these corporations ever filed in the office of the clerk of the county of New York any annual report, as required by law; nor has either of said corporations made any report to the comptroller of the treasury of New York, though both of these reports are required to be made under the laws; nor has either of these corporations ever transacted any business whatever; nor did either of them ever have any principal office or place of business in New York city; nor did either of them ever keep any stock-book, as required by law; nor did either of said corporations file with the secretary of state of West Virginia on or before January 15, 1881, a copy of said articles of association or of the law or authority, under which they were incorporated; nor was a certificate issued to either of said corporations by the secretary of state of West Virginia or recorded by either of said corporations in any coun-

ty of West Virginia; nor did either of said corporations place or file in the office of the clerk of the County Court of any county a copy of its articles of association or do any of the acts required by the laws of West Virginia to be done by such foreign corporations.

The plaintiff in this cross-bill still further alleges, that at the same time, January 15, 1888, and before either of said certificates of incorporation were filed in the office of the clerk of New York county, the defendant, said Hurd, executed with intent to delay, hinder and defraud the plaintiff in this cross-bill and his other creditors three assignments in writing; that is to say: One to Alleghany Iron & Coke Company of all of his property of every kind situated in Taylor county including the lease-premises in Taylor county, W. Va., conveyed to him (Hurd) by said Clerc, consisting of iron-ore mines of the value of many thousand dollars; also another assignment to the said Alleghany Iron & Coke Company of all his (said Hurd's) property of every kind on certain other premises in Taylor county, W. Va., leased to him (Hurd) by Alfred J. Ulman, where there was a blast iron furnace making pig-iron together with said furnace and lease-premises of the value of may thousand dollars; and the third of said assignments was to the Austen Coke Company of all his (said Hurd's) property of every kind on the Austen mines property in Preston county, W. Va., including the lease of the Austen mines property made by Samuel Colgate of New Jersey to said Hurd dated January 2, 1878; that each of these several assignments was promptly recorded in the office of the clerk of the county where the property therein assigned was located, that all these assignments were made at the same time, attested by the same witnesses, and acknowledged by said Hurd before the same notary public; and that they and the said two certificates of incorporation constitute one and the same transaction; that both of these corporations were created by said Hurd with intent to delay hinder and defraud the plaintiff and his other creditors' and for the sole purpose of taking these assignments, and do constitute a part of the fraudulent scheme carried out by said Hurd to hinder, delay and defraud his creditors; that the said Austen Coke Company was not in existence, when said

assignment of it was made; that neither of said corporators ever did or pretended to do any business, or owned or pretended to own any property whatever, except that the Austen Coke Company pretended to own said Austen mines, which continues to be really the property of said Hurd since said assignment, as it was before; that the Austen Coke Company is but another name of said Hurd, and the pretended assignment to it was without consideration and fraudulent as to the plaintiff's claim, and was known and so intended both by the said Hurd and by the other two corporators and trustees composing what was called the "Austen Coke Company;" that, the said Hurd being the president of each of these corporations, they knew all that Hurd knew with reference to these assignments, and were of course aware that they were voluntary and fraudulent as to the creditors of said Hurd, though stated on their face to have been for a consideration of $100.00 and other valuable consideration; that one of these corporations, the Alleghany Iron & Coke Company, has never claimed or pretended to claim the valuable properties so assigned to it as aforesaid; but that the said Austen Coke Company in this original suit claim the whole of the net issues and benefits of the Austen mines, which so came into the hands of said Shaffer, including the money so paid by him into the hands of the receiver of this court in this suit.

The prayer of the cross-bill is as follows: "To the end that plaintiff may be relieved in the premises, he prays, that an attachment may be issued herein against the defendant, Hurd, for said $7,001.15 with interest thereon from 11th August, 1881, and $34.47, the costs of said judgment, and the costs of this suit; that, as to said money paid into the hands of the general receiver of court, plaintiff may have the benefit of the lien of the attachment issued herein, and the benefit of his said attachment issued in his action at law on the 5th day of February, 1881; that the defendant Shaffer may be required to pay out of said $11,915.17, and its accrued interest since it came into his hands, the claim of plaintiff and the costs of this suit; that plaintiff's claim may be paid out of the said $7,043.11, now under the control of this court, in the hands of its general receiver; that the said assignment executed by the

defendant Hurd to the Austen Coke Company of the Austen mines may be set aside and overruled as to plaintiff's claim; that the defendants McCormick and Armstrong be required to pay into court said sum of $5,500.00, with interest thereon from July 2, 1885, hereinbefore mentioned; that the cost of building said twenty new ovens may be charged to the defendant Colgate in payment of his claim for royalties on coal mined by Shaffer after January 15, 1881; and that plaintiff may have in the premises such other, further, and general relief as the nature of his case may require, and to equity appertains."

At the March rules, 1886, the Austen Coke Company filed its answer to this cross-bill. It claimed, that it was a corporation duly incorporated under the laws of New York and duly entered and registered under the laws of West Virginia, and as such entitled to hold property and transact business in these states, and to be fully protected in its corporate rights. The answer avers, that in the exercise of its corporate rights on the 15th of January, 1881, it became the purchaser for a good and valuable consideration of the interest of Charles S. Hurd in certain leasehold property at Austen in Preston county, W. Va., known as the "Austen Mine & Coke Works," conveyed to said Hurd by Colgate by lease dated January 2, 1878, for the purpose of mining coal, and coking and marketing the same; that it at once took possession of said property by its agent, Martin L. Shaffer, who had been the agent of said Colgate and said Hurd, but who was directed to account to the respondent, said Austen Coke Company; and the respondent, said company, from the time of said purchase, January 15, 1881, became the owner of said Austen mines, rents, issues and profits, and is not subject to the attachment issued by the plaintiff in the cross-bill, some three weeks afterwards, on February 5, 1881, against said Hurd, who had no sort of interest or ownership in any of said property levied on as his under this attachment.

In said answer the company denies, that it was created to hinder, delay and defraud the plaintiff and other creditors of said Hurd, or that it was in collusion with him for any such purpose. It denies, that it has no principal office or

place of business in New York city, and that it has not transacted business and has not kept stock and other company books, and says the contrary is the truth. It claims, that all such allegations are impertinent, averring, that while all certificates and reports required have been made and filed, it would not at all affect its rights in this suit, were these allegations true; as it claims that, did all the negligence stated in the cross-bill exist, yet the plaintiff in this cross-bill could take no advantage thereof. This answer asserts, that the Austen Coke Company is a corporation legally created and competent to take and hold the properoty assigned to it; that it transacted business and did purchase and take possession of said property and is the legal owner thereof; that the assignment to it of said property was for a valuable consideration and was in no wise fraudulent, and therefore the defendant, Hurd, had no ownership of any of said property and did not control the same nor the stock of said corporation; and that the said corporation after said assignment owned said Austen mines property and the rents, issues and profits thereof.

The said company makes a part of its answer the record of a suit in chancery brought by it in the United States District Court of West Virginia against said Martin L. Shaffer and others. This suit was brought in April, 1882. It set out the facts alleged in this answer, and asked that Martin L. Shaffer, as the agent and superintendent of the Austen Coke Company, be required to account for the rents, issues, and profits thereof since May 15, 1881. Martin L. Shaffer, Samuel Colgate, and Charles S. Hurd were defendants in this suit, and it prays, that said Shaffer may render an account of his agency as such superintendent of said Austen mines since January 15, 1881, and deliver to the Austen Coke Company full possession of said leasehold property, machines, machinery and all other property on said leasehold premises, as fully as it was granted by said Hurd to the Austen Coke Company.

So far as the record before us shows, it does not appear what has been done, if anything, in this suit in the United States District Court of West Virginia, other than the filing of the bill, or that anything else has been done,

Mary E. Clerc, devisee of F. Leon Clerc, filed an answer to the original bill, in which she claims, that her testator devised to her certain land, which has been leased to the Lancaster Furnace & Mining Company for twenty five years from June 3, 1874; that about two years thereafter the said company abandoned said lease; that by the terms of said lease they had no right to remove a certain railroad track which they had laid down; and, so far as it is on the land devised to her, it is claimed by her as part of the realty. She also claims a portion of the said land as the heir of one of her brothers, who was a lessor of said land and said company, alleging that her testator, F. Leon Clerc, became after the surrender of said lease the owner in fee of said land; and that on November 19, 1877, said Clerc leased said land to said Hurd for fifteen years for the purpose of mining iron ore; that he did this, removing the iron ore to his furnace at Ironton; that on his lease when he quit owning said land that he owed a considerable royalty to her testator, which she claims. She claims, that the railroad iron, if regarded as personalty, should be applied to the payment of the royalty due from said Hurd.

Albert H. Childs filed an answer to this cross-bill, April, 1880. He says the mortgage executed for his benefit by said Hurd, June 10, 1880, was forfeited in July, 1880; that in April or May, 1881, he desiring to possess himself of said Austen mines under this Colgate lease and to have the same sold to pay the amount due him from said Hurd secured by said mortgage, found Martin L. Shaffer in possession of said property, claiming that he had been put in possession of it by said Hurd in January, 1881, under a contract, by which Shaffer was to pay himself a debt Hurd owed him, and pay certain moneys due miners, who had labored in mining on said land; that he learned in April or May, 1881, that the so-called Austen Coke Company was claiming the possession of said mines of Shaffer; and that in May, 1881, he instituted this suit, and Shaffer refused to give him or any one else possession of said moneys or leasehold, but said he would continue to operate them until they were sold, or he was legally dispossessed, or until the expiration of the lease, and pay the proceeds into the court, to be disposed of as it might

direct. He did so operate said mines, till said lease expired in May, 1883, and brought into court $7,043.11, derived from the use of said mines. Childs in this answer claims, that he has the same liens upon the funds so brought into court by Shaffer as he had upon said mines and leasehold-property under his mortgage; that in fact said funds represent said lease; and that said lease has been thus in fact converted into money. He alleges, that in said original suit the court ascertained, that said Hurd was indebted to him $4,696.10 with interest from March, 1882, secured by this mortgage; that no part of this has ever been paid. He claims, that with the money paid into the court by Shaffer there is now sufficient on hand to pay the entire amount due him, and claims that it should be so applied; and he denies that Jeffreys has any lien on this fund or upon said leasehold-property or moneys, till he (Childs) has been fully paid. He claims the rents, issues and profits of the Austen mines under the mortgage to him to satisfy his debt secured thereby amounting to $4,696.10 with interest from March 20, 1882.

Samuel Colgate filed in July, 1886, his answer to said cross-bill. He admits his lease of January 2, 1878, to Charles S. Hurd for five years. He admits the receipt of all the royalty of ten cents *per* ton on all coal mined on said leasehold-property up to January 1, 1881, but alleges, that all accruing since then is still due and unpaid; and he asks that it be decreed to be paid to him, and he states the amount of coal, which has been mined, on which this royalty is due; and he claims, that the royalty due him ought to be paid to him out of the rents and profits of said coal-mines paid into the court by Martin L. Shaffer. He denies, that said Shaffer was his agent to collect said royalty. He avers, that no coke-ovens were erected on said leasehold-property by said Hurd by his direction, and that he is not responsible for any which said Hurd may have erected, and can not be charged with them under his lease to Hurd. All other allegations in the cross-bill are denied.

February, 1881, Charles S. Hurd answered this cross-bill. He denies, that the attachment sued out by Thomas N. Jeffreys was sued out on just grounds, or that the property levied on by the officers under these attachments was his (Hurd's)

property, or that said attachments were a lien on the rents, issues and profits of said Austen mines leasehold-property in the hands of Martin L. Shaffer. He denies, that he became in January, 1881, a non-resident of West Virginia. He avers, that he was then only temporarily absent in New York, where said companies were organized in perfect good faith openly and legitimately for the purpose of operating said coal and iron mines. The assignment to said companies was made in perfect good faith by respondent with no intent to delay, hinder or defraud his creditors. He alleges, that he claims no interest in said Austen mines, as, he says, he transferred and assigned all his interest therein to the Austen Coke Company, which was formed with no fraudulent purpose, but solely for the purpose of enabling the respondent Hurd to pay his debts, which he would have been able to do by the sale of his stock in said company, had not his agent, Shaffer, and the plaintiff, Jeffreys, prevented him from selling said stock or from realizing dividends from the earnings of the said mines and works. He further alleges, that the said company immediately after its organization in January, 1881, established its principal office in the city of New York, and had and kept the stock-book required by law and transacted its business.

*S. P. McCormick, C. Boggess,* and *J. Bassel,* for appellants.

*J. W. Mason,* for Childs and Brown.

*F. Woods,* for E. Jeffreys.

GREEN, JUDGE:

The most important question presented by this record is: To whom does the $7,043.11 paid by Martin L. Shaffer to the receiver of the court under its order entered November 20, 1885, properly belong? It was the proceeds of the mining of the Austen mines by Charles S. Hurd, who was insolvent and unable to work them; and it was understood that out of the net proceeds of these mining operations Shaffer would pay the debt said Hurd owed to him and the debts he owed to sundry miners and laborers. Hurd's interest in said Austen mines, so placed under the management and control of

Shaffer, was a lease of certain coal-lands, about 2,000 acres, known as the "Austen Mines" for five years, by Samuel Colgate to Charles S. Hurd, which lease was created by a contract dated January 2, 1878, and expired May, 1883. After said Hurd had so leased this Austen mines property on August 13, 1879, he executed to John S. Brown and A. H. Childs a mortgage on the said Austen mines and certain other property. The amount of this debt so secured was ascertained to be $1,838.09 with interest from March 1, 1881. On June 10, 1880, said Hurd executed a second mortgage on these Austen mines and other property to the plaintiff, A. H. Childs, to secure a debt of $15,000.00 payable in ten days after date. The amount due on this debt so secured, as afterwards ascertained, was $4,696.10 with interest from June 1, 1881, till paid. Of this sum paid in by Shaffer, Childs and Brown claim enough to pay the balance due on their mortgage, of $1,838.09 with interest from March 1, 1881. A. H. Childs claims, that then the residue of the said fund should be paid on the debt secured by the mortgage to him. The balance due on it is $4,696.10 with interest from January 1, 1881. In opposition to both these claims E, G. Jeffreys claims the whole of this fund under his attachment served on said Hurd's interest in the Austen mines property on February 15, 1881, and the court below based its action on this as the correct view.

It is insisted in argument by the counsel of Jeffreys, that the claims of Childs and Brown as mortgagees to this fund are invalid, because their mortgages, while prior liens on the lease of Austen mines by Colgate to Hurd, created no lien on the rents, issues and profits of the Austen mines. They had liens on the *corpus* of this lease; but as long as the mortgagor, Hurd, remained in possession, he and not his mortgagees were entitled to the issues and profits of the lease. The only way, in which the mortgagees could be entitled to the rents and profits, was to take possession of the property, which they had a right to do at any time after forfeiture or non-payment, when due, of the debts secured by the mortgages. This they had not done, but Hurd, the mortgagor, or his agent, Shaffer, remained in possession of the mines, taking the rents and profits till the expiration of the lease of Colgate to Hurd.

The law is well settled, that a mortgagee is not entitled to demand of the mortgageor or owner of the equity of redemption the rents and profits of the mortgaged premises, until he has actual possession.  The rule on this subject is thus stated in Bacon's Abridgment, tit. "Mortgage," C:  "Although the mortgagee may assume possession of ejectment at his pleasure, and according to the case of *Moss* v. *Gallimore*, 1 Doug. 279, may give notice to the tenants to pay him the rent at the time of the notice, yet, if he suffers the mortgageor to remain in possession or in receipt of the rents, it is a privilege belonging to his estate, that he cannot be called upon to account for the rents and profits to the mortgagee, even although the security be insufficient."

In *Higgins* v. *Building Co.*, 2 Atk. 107, Lord HARDWICKE thus states the law : "In the case of a mortgagee, where a. mortgageor is left in possession, upon a bill brought by the mortgagee for an account in this court he can never have a decree for an account of rents and profits from the mortgageor for any of the years back during the possession of the mortgageor."  And again, in *Mead* v. *Lord Orrery*, 3 Atk. 244, he says : "As to the mortgageor, I do not know any instance, where he keeps in possession, that he is liable to account for the rents and profits to the mortgagee, for the mortgagee ought to take the legal remedies to get into the possession."

The American decisions sustain this rule.  So long as the mortgageor is allowed to remain in possession, he is entitled to receive and apply to his own use the increase and profits of the mortgaged estate ; and, although the mortgagee may have the right to take possession upon condition broken, if he does not exercise the right, he cannot claim the rents ; if he wishes to receive the rents, he must take means to obtain the possession.  See *Wilder* v. *Houghton*, 1 Pick. 87 ; *Bank* v. *Reed*, 8 Pick, 459 ; *Noyes* v. *Rich*, 52 Me. 115 ; *Clarke* v. *Curtis*, 1 Gratt. 289 ; *Beverly* v. *Brooke*, and *Same* v. *Scott*, 4 Gratt. 208, 209 *et seq.* ; *Allen* v. *Gibson*, 4 Rand. (Va.) 468 ; *Gilman* v. *Telegraph Co.*, 91 U. S. 603, 617 ; *Teal* v. *Walker*, 111 U. S. 248, (4 Sup. Ct. Rep. 420.)

While it is not disputed, that this is the law, yet it is insisted, that it has no application, when the mortgaged

estate is a leasehold and not a fee-simple. The interest of the mortgageor, Hurd, in the Austen mines was a lease of five years; and it is argued by the counsel for the mortgagee, that this was but a right to use these Austen mines for five years. These funds derived from the use of the mines by Shaffer were not strictly speaking rents and profits. They represent the lease itself. It is all that is left of the thing mortgaged. The mortgaged premises being so converted into money, the mortgageors are entitled to the fund as the equivalent of the lease. When a tenant mortgages his crop, it cannot be said that this crop is rent, although it issues out of the land. But certainly a court of equity would preserve for the benefit of the mortgagee the fund, into which the crop has been converted.

The error in this reasoning is the assumption, that under Colgate's lease Hurd had simply the right to take the rents. and profits of the Austen mines for five years; and that it was really these rents and profits for five years which he afterwards mortgaged. On the contrary what Hurd owned and mortgaged was a leasehold-estate in the land known as the "Austen Mines;" and whether it was a leasehold-estate or a fee-simple estate mortgaged, till the mortgagee takes actual possession of the estate, which he has a right to do, the rents belong to the mortgageor. It was so decided in *Mayo* v. *Fletcher*, 14 Pick. 525.

But there is another ground, on which the mortgagees in this cause insist, that they were entitled to the fund in court arising out of the issues and profits of the mortgaged estate. They admit, that the law is correctly stated by Judge BALDWIN in *Beverly* v. *Brooke* and *Same* v. *Scott*, 4 Gratt. 212. He says: "It is true that a mortgagee's right to receive the profits is an incident of his possession, and, if he permits the mortgageor or subsequent incumbrancers to retain the possession and enjoy the profits, he cannot recover them by action at law or suit in equity. But the appointment of a receiver is in the nature of an injunction, which defeats the mortgagee's power of election. He cannot take possession if he would. The court takes and preserves it for him until his right of priority is established. If he be a party to this suit, he has nothing to do but wait the decision of the contro-

versy, and receive the rents from the hands of the court."

It is certainly the general rule in a suit to foreclose a mortgage or to sell the mortgaged estate, to pay the debt secured by a mortgage, that the mortgagee has no claim to the rents and profits of the mortgaged estate, till it is taken possession of by a receiver appointed by the court; but it is insisted, that if in addition to seeking to foreclose the mortgage or to sell the mortgaged estate to pay the debt secured by it the bill seeks to subject the future rents and profits of the mortgaged estate to the payment of the debt secured by the mortgage, the court will apply such future rents and profits after the institution of such suit to the payment of the mortgage-debt, if it be necessary in order to satisfy the same; and such rents and profits after the institution of such suit do not belong to the mortgagee, nor are they subject to his control nor to that of any person claiming by through or under him. And the case of *Dow* v. *Railroad Co.*, 20 Fed. Rep. 768, is relied upon as sustaining this principle.

It was there held, that the mortgagor of a railroad, though the mortgage covers income, can not be required to pay the mortgagee for earnings, while the property remains in his possession, until a demand has been made on him therefor or for a surrender of the possession under the provisions of the mortgage. This was also in effect decided in *Railroad Co.* v. *Cowdrey*, 11 Wall. 459. If however the suit is not simply for the foreclosure of the mortgage or sale of the railroad to pay the mortgage-debt, but also that the mortgageor may be required to surrender the possession of the railroad, the mortgagee would be entitled to the earnings. The mortgagee, it was held in this case, was entitled to the income and profits of the railroad from the institution of the suit, and not from the time the receiver of the railroad was appointed some time afterwards. The ground of this decision was, that after the institution of such a suit the company or mortgageor wrongfully withheld the possession, and under such circumstances equity forbids, that it should retain as against the mortgagee the fruits of its refusal to do what it ought to have done. If it had done so, when the suit was brought, a receiver would have been unnecessary.

Upon the principles laid down in these decisions of the

Supreme Court of the United States, which seem to be sustained by good reason, it would appear to follow, that, if a suit was brought by a mortgagee not only to foreclose a mortgage-debt but also asking the court in the mean time to put the mortgagee in possession of the estate or to appoint a receiver and appropriate the rents and profits of the estate to the payment of the mortgage-debt, the mortgagee ought to have a right to have the rents and profits so applied from the institution of such suit and not from the time only, when a receiver was appointed and took possession of the mortgaged estate; for then the improper retention of the possession of the mortgaged estate by the mortgageor after the institution of such suit would be permitted to inure to the benefit of the wrong-doer, and equity forbids, that the mortgageor should retain against the mortgagee the fruits of his refusal to do what he ought to have done.

But it is claimed by the counsel of the mortgageor, that the cause before us was simply a suit to foreclose a mortgage or to sell the mortgaged premises to pay the mortgage-debt, and not either to obtain possession of the mortgaged estate, or to have it put into the hands of a receiver, and the rents and profits applied to the payment of the mortgage-debt. It is true, the bill was very imperfect, and its prayer was simply, " that the mortgaged estate might be sold, and the plaintiff's mortgage-debt be paid out of the proceeds of such sale, and for further and general relief." But Martin L. Shaffer was made a defendant to the bill. If the obtaining of this specific relief was the whole object of this suit, it was obviously improper to make him a defendant; for he was, so far as the bill showed, a mere agent or person claiming and holding possession under and for the mortgageor, Hurd, and he had, as shown by the bill, no interest in this suit and could only properly have been made a party defendant to it with the view of holding him responsible for the future rents and profits of the Austen mines, a part of the mortgaged estate, or of requiring him to surrender the possession of them, that they might be paid to the party entitled to them; and. the counsel for the mortgagee claims, if this be so, that the general prayer for relief ought to be regarded as including in it a prayer, that Shaffer should surrender the possession of

the Austen mines to the mortgagee; or to a receiver of the court, or that he be regarded and treated as a receiver of the court.

The only allegation in the bill in reference to Shaffer is this: "The plaintiff further says that Martin L. Shaffer is now in possession of and operating the Austen mine lease by contract with said Hurd;" and the prayer of the bill is for the sale of the mortgaged property, and that out of its proceeds the plaintiff's debt as mortgagee be paid, and for such further and general relief as the court may see fit to grant. Upon this state of facts, the only relief, which could be granted against the defendant, Martin L. Shaffer, would be a decree directing him to surrender this Austen mine leasehold to a receiver of the court or to a mortgagee, or a decree treating him as a receiver of the court from the time the bill was filed (June rules, 1881) and requiring him to account for the rents and profits received pending the suit; and to such rents and profits upon the principles laid down above the mortgagees would be entitled. But they could not be entitled to the rents and profits received by Hurd or by Martin L. Shaffer, his agent, prior to the institution of this suit.

I do not think, that we do unreasonable violence to the meaning of the bill, when we regard the general prayer for relief against Shaffer as the equivalent of a demand for the Austen mines lease, so that the mortgagees may have the rents and profits of the same thereafter.

There is another and insurmountable objection to the validity of the claim of Jeffreys to this fund. He claims it by virtue of an attachment of these rents and profits of the property of Hurd, the mortgageor, in the hands of his agent, Shaffer. But when this attachment was served on Shaffer, August 11, 1881, these funds were under the control of the court in this chancery cause, it having been instituted May 19, 1881, and therefore not liable to be attached. After the institution of this suit no attachment could be levied upon the goods and affects, which were sought to be subjected in the suit, though they had not been taken actual possession of by the officer of the court. See *Hagedon* v. *Bank,* 1 Pin. 61. The principle underlying this law is, that after one

court has taken charge of property with a view of disposing of it according to the rights of all parties, no other court can interfere with it by seizing and disposing of the property under an order of attachment or any other order. See *Taylor* v. *Carryl*, 24 Pa. St. 259. From the moment the chancery court obtained jurisdiction over the property or funds, the power of another court to dispose of the property under an order of attachment or in any other manner is necessarily excluded. Now, when a chancery court can legitimately appoint the receiver of property or of a fund, it has the exclusive jurisdiction from the moment it is asked to appoint a receiver or to dispose of the property or 'fund, provided it subsequently appoints such receiver or disposes of the property. If the plaintiff in a chancery suit claims certain property or fund and asks legitimately the appointment of a receiver of the funds and makes defendants all persons having any claims to the fund, all persons, who set up any claim to the fund, must do so in such suit, and no subsequent suit can change the rights of any of the parties.

The suit before us was instituted May 10, 1881, by Childs, the mortgagee of the lease by Colgate to Hurd of the Austen coke-lands in Preston. The defendant in the suit was not simply the mortgagcor, Hurd, but very many other creditors of Hurd,—all of his creditors according to the allegations of the bill, who had any lien on said mortgaged property, or any other property of said Hurd by judgment or in any other manner. By the decree of August 11, 1881, with the consent of all parties it was decreed, that this cause be referred to a commissioner of this court to ascertain and report all the property both real and personal of said Hurd in the State of West Virginia together with the liens thereon and their respective priorities.

In view of the character of the bill in this cause and especially in view of those, who are the defendants in said suit, and in view of the character of this consent-decree and of the fact, that its entry was consented to by said Jeffreys, it does not seem to me, that we ought not to regard this as simply a bill to foreclose a mortgage and sell the Austen coke-lands, but as having a far wider scope, including in the

objects of the suit the ascertainment of all the claims or liens on the rents, issues and profits of said Austen coke-lands in the hands of Martin L. Shaffer, as alleged in the bill, and the ascertainment by the Court of the rights of all parties to these rents, issues and profits. So regarding this bill, from the moment this suit was instituted, May 19, 1881, the determination of the person or persons who were entitled to these rents, issues and profits was submitted to the Court, and none of the defendants could thereafter acquire any new or additional claim to the same by issuing attachments for their claims, or in any other manner. For any other claimant would be a *lis pendens* purchaser, and by such purchase *pendente lite* could acquire no right against the original parties to the suit; for property or a fund so situated can not be attached, being really in the custody of the law.

This we regard as substantially the case before us. It is true, there was no direct claim in the bill of the funds in the hands or which might come into the hands of Shaffer by the mortgagee of the property, out of which the fund arose or would arise. But the plaintiff stated in the bill, that this mortgaged property was in the possession of Shaffer, an agent of the mortgageor, and the suit, as we have seen, sought the decision of the Court as to who were the lienors on all the property of the mortgageor real or personal, including of course those rents and profits in the hands of Shaffer, and their priorities.

When this suit was instituted the Chancery Court of Taylor county acquired jurisdiction in the cause to pay out the funds in Shaffer's hands, or which might come into his hands from the Austen coke-mines, the mortgaged property, to the parties entitled thereto, and neither Jeffreys nor any party to this suit could acquire precedence of right to this fund by subsequently suing out an attachment against the mortgageor, Hurd. I am therefore of opinion that Jeffreys's attachment gave him no additional right to the fund, which came into the hands of Shaffer.

The Austen Coke Company's claim to this fund is based on an assignment of the Austen mines lease by the mortgageor, Hurd, on January 15, 1881, which preceded the institution of this suit and was also some twenty days prior to

the issuing of the attachment of Jeffreys against said Hurd. Its claim would be apparently better than that of Jeffreys to said fund, arising from the product of said Austen mines lease, provided this assignment of the Austen mines lease to the Austen Mine Company was for a valuable consideration and *bona fide*; but in the said cross-bill of Jeffreys this assignment is charged to be fraudulent, voluntary and void as against the creditors of said Hurd. The allegations in this cross-bill on this point are as follows :

The plaintiff is informed, and he accordingly alleges, that on January 15, 1881, about ten days after he had put his agent, Shaffer, in charge of the Austen mines, the defendant Hurd, who was then utterly insolvent and worthless, appointed with himself two other persons, under chapter 40 of the Laws of New York State, passed in the year 1848, and the several laws of the State of New York subsequently made by way of amendment thereof, and formed two distinct joint-stock corporations,—the same three persons being the only incorporators and trustees of both corporations, one being called the "Alleghany Iron & Coke Company;" the other being called the "Austen Coke Company;" both having their principal office in the city of New York,—for the purpose of conveying and assigning to these two corporations all the property owned by him, including the Austen mines, with intent to hinder, delay, and defraud the plaintiff and his other creditors in the collection of their claims against him. That the certificates of the formation of both these corporations were signed, made, and acknowledged on the same day, January 14, 1881, before the same notary public ; and at the same time, on the next day, they were both filed in the office of the clerk of New York county, in the State of New York. That no duplicates of either certificates were ever filed, as required by law, in the office of the comptroller of the treasury of the state of New York; nor has either corporation ever filed in the office of the clerk of the county of New York any annual report ; nor has either corporation ever made any report to the comptroller of the treasury of the state of New York,—both of which last-named two reports are by law required to be made annually, under oath; nor has either corporation ever had, or pre-

tended to have had, any principal office or place of business whatever; nor has either corporation ever had, or pretended to have, any principal office or place of business in New York city, or kept, or pretended to keep, any stock-book, as required by section 25 of chapter 40 of the Laws of New York for the year 1848; nor did either of said companies file with the secretary of state of West Virginia on or before January 15, 1881, a copy of the articles of association, or of the law or authority under which they were incorporated; nor was a certificate issued to either of said corporations by the secretary of state, or recorded by either of said corporations in any county in West Virginia; nor did either corporation place or file in the county clerk's office a copy of its articles of association, nor do any of the things required by the laws of West Virginia to be done by foreign corporations. On January 15, 1881, and at the same time, said Hurd executed, with intent to hinder, delay, and defraud the plaintiff and his other creditors, the following three assignments in writing; that is to say: One to the Alleghany Iron & Coke Company of all his property of every kind, situated on and including certain leasehold-premises in Taylor county, W. Va., conveyed to him by. F. Leon Clerc, consisting of iron ore mines of a value of many thousand dollars; one to the same corporation of all his property of every kind, situated in and including certain leasehold-premises in said county of Taylor, conveyed to him by Alfred J. Ulman, whereon for two years he had carried on a large blast iron furnace for making pig-iron, of the value of many thousand dollars; and one to the Austen Coke Company of his property of every kind situated on and including said Austen mines property, in Preston county, W. Va., of the value of many thousand dollars. These three assignments were made at the same time, and attested by the same witnesses; were acknowledged by said Hurd, at the same time, before the same notary public; and they, with the two certificates of incorporation, constitute one and the same transaction, and constitute together part of the fraudulent scheme carried out by said Hurd to hinder and delay his creditors. That the said two companies were neither of them in existence when said assignments were executed by said Hurd."

The following is a copy of this assignment to the Austen Coke Company :

"Know all men by these presents, that I, Charles S. Hurd, of Ironton, West Virginia, party of the first ———, for and in consideration of the sum of one dollar and other good and valuable consideration, lawful money of the United States, to me duly paid by the Austen Coke Co., have sold, and by these presents do grant, convey, assign, and transfer and set over, unto the said Austen Coke Co., the indenture of lease bearing date the second day of January in the year one thousand eight hundred and seventy eight, made by Samuel Colgate, of Orange, county of Essex, state of New Jersey, of the first part, and said Charles S Hurd, of Ironton, county of Taylor, state of West Virginia, of the second part ; the same being witnessed by Augustus P. McGraw. Said lease covers about two thousand acres of coal land in Austen, county of Preston, state of West Virginia, and other property, with all and singular the premises therein mentioned and described, and the buildings thereon, together with the appurtenances,—to have and to hold the same unto the said Austen Coke Co., or its assigns, from the fifteenth day of January, 1881, for and during all the rest, residue, and remainder yet to come of and in the term of seven and one-half years mentioned in said indenture of lease ; and I hereby sell, assign, and transfer to said Austen Coke Co. all the tools, machinery, mules, and personal property of any and all kinds belonging to me now on said premises, or used in working said mines ; subject, nevertheless, to the rents, covenants, conditions, and provisions therein also mentioned ; and I do hereby covenant, grant, promise, and agree to and with said Austen Coke Co. that the said assigned premises now are free and clear of and from all former and other gifts, grants, bargains, sales, leases, judgments, executions, back rents, taxes, assessments, and incumbrances whatsoever, except one mortgage, made by the party of the first part to J. S. Brown and A. H. Childs, to secure twelve thousand dollars, and one to A. H. Childs, to secure any balance due to him on account. In witness whereof I have hereunto set my hand and seal this 15th day of January, one thousand eight hundred and eighty-one. CHARLES S. HURD. [Seal.]"

Charles S. Hurd in his answer says: "The Austen Coke Company was duly and fully organized under the laws of the state of New York, and has been duly authorized to transact and carry on business under the laws of West Virginia, having fully complied with the statute relating to foreign corporations; that this respondent does not constitute said company, and is not authorized to act for it; that the assignment of the lease of Samuel Colgate to respondent, dated January, 1878, and by respondent to said Austen Coke Company, was made in perfect good faith, and for a valuable consideration, and this respondent has no further interest therein. Respondent further says that it is not true that said Martin L. Shaffer holds possession of such leasehold premises under this respondent. Said Shaffer holds under and by an arrangement with said Austen Coke Company, and is accountable to and should account to it alone."

In the answer of the Austen Coke Company the allegation, that there is no such company as the Austen Coke Company, but that it is an assumed name for said Hurd, is flatly declared untrue. Said answer avers, that on the contrary, the Austen Coke Company is a corporation duly organized and chartered under the laws of the state of New York and fully authorized to do business within the state of West Virginia, as will appear by the certificate of Randolph Stalnaker, Secretary of State, a copy of which is filed. The certificate is dated August 25, 1881, and was recorded in Preston county August 25, 1881. The certificate is, that on August 25, 1881, said company filed in the office of the Secretary of State a copy of the law, under which they are incorporated. The evidence showed, that there were stockholders in said company, who became *bona fide* stockholders in the spring and summer of 1881, and who proved in a general way the truth of these general allegations in these answers. But there was no proof as to the consideration of the assignment by Hurd of this Colgate lease of the Austen mines to the Austen Coke Company. But from the evidence in the cause the inference to be drawn is, that no money was paid to Hurd to obtain this transfer, and that he organized said Austen Coke Company and transferred to it the Colgate lease and the Austen mines property under the expectation.

that after the organization of the company enough stock of the company could be sold to furnish the corporation with funds sufficient to pay off the debts due from said Hurd on account of said Austen mines property, and successfully carry on the coking business at said mines. But, while Hurd hoped to do this by the organization of these companies, he was disappointed in this expectation. These corporations after their organization disposed of but a few shares of their stock to *bona fide* purchasers. The assignment of Colgate's lease by Hurd to the Austen Coke Company is dated January 15, 1881, and professes to be "in consideration of the sum of one dollar and other good and valuable considerations, duly paid to the said Hurd by the said Austen Coke Company."

The cross-bill charges that this Austen Coke Company never had any existence. But, though there are many acts required by the laws of New York as well as the laws of West Virginia, to be done by every corporation which this company is not shown to have done, and though by its failure to perform these required acts it may have forfeited its charter, yet these causes of forfeiture cannot be taken advantage of in this suit, nor enforced against the Austen Coke Company, a private corporation, collaterally or incidentally or in fact in any other manner than by a direct proceeding for that purpose against it, which it would have the opportunity to answer. The State alone can institute such a proceeding, and, as the charter of the corporation is a compact with the State, it may like an individual waive a broken condition of the compact and not enforce the forfeiture. *Lumber Co.* v. *Ward*, 30 W. Va 43, 49, *et seq.* (3 S. E. Rep. 227). While, then, the court was bound to regard in this suit the Austen Coke Company as an existing corporation, yet it was then in this case required to do more, and to ascertain when it came into existence; for it is claimed by the appellant, that it came into existence subsequently to the assignment to it by Hurd of this Colgate lease of the Austen Coke Company mines property, on January 15, 1881, and that therefore this assignment was a nullity; and this position is apparently sustained by the evidence.

The laws N. Y. 1848, §§ 1, 22, required the certificate of every company to be filed with the clerk of the county, in

which the business shall be carried on, and that a duplicate thereof shall be filed in the office of the Comptroller. of the Treasury of New York. Whenever this is required by statute, as it is in many States, it is properly held, that the filing of this original certificate with the clerk is an indispensable prerequisite to the creation of the corporation, and that, until this has been done, it has no existence; and that may be shown incidentally and taken advantage of collaterally, whenever the fact of incorporation is in any form called into question. See *Mining Co.* v. *Woodbury*, 14 Cal. 425. By the wording of the New York statute as well as that of other states the filing of this certificate in the proper offices must occur, before any of the rights and privileges of a corporation are conferred. See, also, *Abbott* v. *Smelting Co.*, 4 Neb. 416; *McIntire* v. *Association,* 40 Ind. 104; *Mining Co.* v. *Herkimer*, 46 Ind. 142; *Doyle* v. *Mizner*, 42 Mich. 332, (3 N. W. Rep. 968.); *Field* v. *Cooks*, 16 La. Ann. 153. I have found no decision of the New York court of appeals on this point, but the Court of Common Pleas of New York City has decided, that under the New York law the filing of the certificate of incorporation in the office of the clerk of the county, though not the filing of the duplicate in the office of the comptroller of the treasury, is an essential prerequisite to the existence of the corporation; and this we must hold to be the law of New York both on reason and authority. See *Raisbeck* v. *Oesterricher*, 4 Abb. New Cas. 444.

The cross-bill of Jeffreys expressly charges, that the certificate of incorporation of the Austen Coke Company was signed, made and acknowledged before a notary public on January 14, 1881, and on the next day it was filed in the office of the clerk of the county of New York in the state of New York, and that no duplicate of this certificate of incorporation was filed in the office of the clerk of New York county. On January 15, 1881, Hurd executed this assignment of all property of every kind comprising the Austen mines property in Preston, including said lease of the Austen mines. It is denied that this assignment was made without valuable consideration, to hinder, delay, and defraud the creditors of said Hurd; but there is no denial of the express charge in the cross-bill, that this assignment was made be-

fore the certificate of incorporation of said company was filed in the clerk's office of the county court of New York. This charge therefore must be regarded and treated as admitted to be true. There is not a particle of evidence on this point and nothing to show, when this assignment was executed by Hurd, except simply the date of it, January 15, 1881; and, as the certificate of the incorporation of the Austen Coke Company was filed in the office of the clerk of the county of New York on that day, of course this is entirely consistent with the admission, that this assignment was executed first and before the filing of this certificate in said clerk's office, and therefore before the assignee in the assignment, the Austen Coke Company, had any existence; for under the laws of New York we have seen, it had no existence, until this certificate of its incorporation was filed with the clerk in his said office in the county of New York.

This of course rendered the assignment null and void, if it had not been made to hinder, delay and defraud the creditors of the assignor. But it was so made. The plaintiff in this cross-bill alleges, that, before this assignment was made, this corporation owned no property whatever, and could not and did not pay to said Hurd any consideration whatever for the property so assigned to it; that by these assignments said Hurd utterly divested himself of all property owned by him and became thereby utterly insolvent, and has continued so ever since. There is a denial of the truth of this allegation in the answer of the Austen Coke Company; but there is no statement of what was the consideration paid by the Austen Coke Company for said assignment by Hurd to it, and nothing to prove any consideration except the recital in the assignment, that it was for one dollar in hand paid and other valuable considerations. All that the answer says on this subject is, that on the 15th day of January, 1881, it became the purchaser for a good and valuable consideration of the interest of Charles S. Hurd, its co-defendant, in certain leasehold property at Austen in Preston county, W. Va., known as the "Austen Mines & Coke Company," "conveyed to said Hurd by said Colgate under written lease of January 2, 1878." The cross-bill having charged that this assignment was voluntary and for that reason void as against the plaintiff

and other then existing creditors of the said assignor, under the settled law of this State the recital in this assignment of the payment of the consideration for the property is not evidence of such payment or consideration as against the existing creditors of the assignor, who are assailing such assignment as voluntary and therefore fraudulent as to existing creditors. See *Cohn* v. *Ward*, *supra* p. 34. See, also, *Rogers* v. *Verlander*, 30 W. Va. 619, (5 S. E. Rep. 847), and *Knight* v. *Capito*, 23 W. Va. 689.

In such a case, the burden of proving, that the deed or assignment was made for a valuable consideration rests upon the grantee or assignee; and this burden the Austen Coke Company has failed to meet, and the Court below therefore did not for these reasons err in regarding as null and void this assignment in the decrees of which the appellant complains.

The Austen Coke Company's claim to this fund paid into Court by Shaffer was worthless. This fund being the proceeds of the Austen coke mines, which was by this void assignment attempted to be assigned to the said Austen Coke Company, Samuel Colgate by his counsel claims, that he is entitled to $5,420.50 of this fund, that being the amount due from said Hurd under his lease to said Colgate of said Austen mines property, as royalty for coke taken from said property by the lessee, Hurd, and not paid by said Hurd to the lessor, Colgate. This lease was for 2,000 acres of land, with the privilege of working coal-mines on said land, and run for five years from May 1, 1878, the coal mines then already opened, with the buildings erected, levels, drifts, road-works, engines fixed, machinery, fixtures and all other things on said premises used for getting coal from under said land and coking the same, "yielding and paying during said term of five years the royalty of ten cents for every ton of coal, which shall in any year be gotten out of the said premises, to be paid quarterly within thirty days next after the close of the quarter year;" and by said lease it was agreed that, "whenever any part of said rent and royalties shall be in arrear for the period of thirty days after the same shall have been duly demanded, the party of the first part, Samuel Colgate, may enter into and distrain upon said mines and premises

and coal and dispose of the same in due course of law as landlord."

This lease gave to the landlord, Samuel Colgate, a lien on all the coal mined on said land to pay his royalty when due and demanded. The fund paid by Shaffer into the court in this suit was the product of the coal mined on said land during the continuance of this lease. The claim set up by Samuel Colgate in this suit to be paid his unpaid royalties was such a demand as gave him a complete and first lien on the proceeds of the coal in the hands of the court, to be paid the entire amount due to him for royaltias which remained unpaid. This amount was ascertained in the suit, and the court below ought to have had it first paid out of the moneys in the hands of the receiver in the cause and paid into the court by said Shaffer as the first lien upon the same.

But it is claimed by counsel in this court, that Samuel Colgate is entitled to nothing on account of unpaid royalty under this lease, because said Hurd, the lessee, had constructed some twenty new coke-ovens on the leased premises at a cost of more than $4,000.00, which at the expiration of the lease would add largely to the value of the leased premises, which would inure to the benefit of Colgate, and therefore the value of these new coke-ovens should be deducted or set off against the amount due Colgate, for royalty. This position cannot be maintained. In the lease of Colgate to Hurd is the following provision: "The party of the second part, said Hurd, may remove for his own benefit all engines, machinery, and fixtures he shall have erected and set up on the said premises or any part thereof; first giving the party of the first part, said Colgate, the option of purchasing the same, or any part thereof, at a fair valuation." The law regards with peculiar favor the right of tenants to remove articles annexed by them to the freehold and extends much greater indulgence to them in this respect, than it concedes to some other classes of people. See *Thomas* v. *Crout*, 5 Bush, 37; *Wall* v. *Hinds*, 4 Gray, 256; *Elwes* v. *Maw*, 3 East 38, 2 Smith, Lead. Cas. (7th Amer. Ed.) 212, 228, notes.

Under the provision in the lease above cited there can be

no question, but that the lessee, Hurd, could have removed the new coke-ovens, which he put on this land and premises during the continuance of the lease, and it might have been extended to such further period, as the tenant continued to hold possession as tenant. See *Weeton* v. *Woodcock*, 7 Mees. & W. 14. But there was no possession here by Hurd or his assignee as tenant after the expiration of his five-years lease, and as tenant he would have no right to enter on the premises after the expiration of his time for the purpose of removing these coke-ovens, which he had put there, or any other fixtures. See *Leader* v. *Homeward*, 5 C. B. (N. S.) 546. When the tenant quits the premises leaving his fixtures behind him, it will be presumed, that he intended to abandon them. See *Penton* v. *Robart*, 2 East 88; *Dubois* v. *Kelly*, 10 Barb. 496; *Connor* v. *Coffin* 22 N. H. 541.

It is however insisted by the counsel for the appellee, Jeffreys, that this claim of Colgate for unpaid royalty was not proven and was therefore properly rejected. It was proven by Jessup, that Shaffer, said Hurd's agent, mined on these leased premises after January 1, 1881, in all 54,205 tons of coal, the royalty on which at ten cents a ton would be $5,420.50. Jessup kept for Shaffer an account of mining of coal and manufacturing of coke, so that his statement of the quantity of coal mined at these Austen mines, which were in the possession and under the control of Shaffer as agent for Hurd, the lessee, is important; and he states, that no royalty for any of this coal so mined after January 1, 1881, was ever paid to Colgate. This evidence satisfactorily establishes Colgate's claim.

Another ground for rejecting this claim is urged by counsel: that none of the commissioner's reports allowed this claim, and that Colgate did not except to any of these reports but abandoned his claim, if he has ever had any. He must be held to have acquiesced in these reports, which ignored his claim by failing to report it. See *Thompson* v. *Catlett*, 24 W. Va. 525; *Chapman* v. *McMillan*, 27 W. Va. 220. The first of these reports was made under an order of reference, which directed the commissioner to ascertain and report all the property real and personal, belonging to said Charles S. Hurd in the state of West Virginia together with the liens

thereon and their respective priorities. Though the bill had stated, that the coal-mines had been worked since January 1, 1881, by Shaffer for the lessee, Charles S. Hurd, yet neither the commissioner nor any of the parties nor their counsel understood this order of reference as directing the commissioner to ascertain, what moneys were in the hands of Shaffer belonging to said Hurd, and he accordingly made no report on this subject. It is by no means clear, that the commissioner did not properly interpret the order of reference; but, whether he did or did not, his failure to make any report on the subject of this fund in the hands of Shaffer certainly would not forfeit the claim of Colgate to this fund or some part of it, because he did not insist upon his claim being reported. He had nothing to except to but the failure of the commissioner to report on this subject, and if it was an abandonment of his claim to any part of this fund, as no exception was filed by any party to the commissioner's report because of this omission, all the parties to this suit, including Jeffreys, must be for the same reason regarded as abandoning all claim to this fund. This is an absurdity; and in truth none of the parties, in order to preserve their claim to this fund, were under any obligations to except to the commissioner's report because of its failure simply to make any report on this subject.

This report was recommitted to the commissioner with express directions to make settlement of the accounts between the defendant Albert H. Childs and said Charles S. Hurd, but with no directions to settle the accounts of Martin L. Shaffer as agent of Charles S. Hurd, nor with any directions to ascertain the amount of the fund in the hands of said Shaffer, and to whom it should be paid. There was in this report of the commissioner under this order of reference no allusion to this fund in the hands of Shaffer, and no exception to the report on this account by Colgate or any one else, and no necessity for such exception in order to prevent the forfeiture of their claim to this fund or any part thereof.

But on November 20, 1885, on the motion of Samuel Colgate, "this cause was recommitted to the commissioner to ascertain and report to the court what sums, if any, remained unaccounted for to said Colgate of the royalty of ten cents

*per* ton of coal mined and reserved to him in his lease to the defendant, Hurd, dated January 2, 1878, and what sums of money have been expended by M. L. Shaffer on said leasehold by permanent improvements in addition to ordinary repairs and necessary repairs, and at what time; and said commissioner shall certify all the evidence and facts upon which this report and also the report of November 4, 1885, is based, and also from what source the funds in said Shaffer's hands were derived." His report was made October 15, 1882, and was, that Martin L. Shaffer filed a statement of his accounts showing that on the 1st day of May, 1883, there was in his hands as follows :

Total amounts of receipts from coke and coal.......:...............$74,908 84
Total disbursement................................. .........................68,165 73

$6,743 11

Then follows in the report a minute statement of the personal property, which was on hand the 15th of January, 1883, the time said Shaffer took possession of the Austen coke and coal mines, and then a list of uncollected claims for coke and coal amounting to $2,695.92; and he reports that no rent had been paid on the store-room occupied by Shaffer since December 13, 1879. This was the whole of this report.

There was no ascertainment of the liens or claims on this fund in the hands of Shaffer and no exception to the report because of this. The commissioner and the parties not having regarded it as required to be stated by the decree of reference, clearly neither Colgate nor any one else can be regarded as having forfeited or abandoned any claim to this fund, because the commissioner failed to report on the claims of any of the parties to this fund.

This report was recommitted to the commissioner at the November term, 1885, with directions to "ascertain and report, what sums, if any, remained unaccounted for to the said defendant Samuel Colgate of the royalty of ten cents *per* ton of coal reserved to him in his lease to the defendant Hurd, dated January 2, 1878, and what sum or sums of money have been expended by M. L. Shaffer on said leasehold premises by way of permanent improvement in addition to ordinary and necessary repairs, and at what time, and also to certify

all the evidence and facts on which his previous report was based, and also from what source the funds in Shaffer's hands were derived."

In this report the commissoner re-stated the balance in the hands of Shaffer, corresponding with his former report, and he stated, that there was in his hands the proceeds of the sale of three mules, $300.00; and that he was responsible for rent of the store-house on leased premises from January 13, 1881, to May 1, 1883; but there was no evidence in the cause showing the amount of said rent. He submits to the court the question, whether Shaffer should pay any interest on the funds in his hands. The following is the report in reference to the claims to this fund:

"Statement of the liens upon the funds in the hands of Martin L. Shaffer:

"First in priority:
Childs and Brown, monthly balance, March 1, 1881........ $1,838 09
Interest March 1, 1881, to November 4, 1885.................... 515 58
                                                                            ----------
                                                                            $2,353 67
"Second in priority:
Albert H. Childs............................................ $4,696 10
Interest 1st June, 1881, to November 4, 1885..... 1,246 81
                                                                  -------- $5,942 91
                                                                            ----------
                                                                            $8,266 58

"For evidence of the two foregoing claims see deposition of Albert H. Childs, and commissioner's report No. 2, filed in this cause the 11th day of February, 1882. After the payment of the above two claims the Austen Company is entitled to any balance remaining in the hands of said Shaffer.

"Special matter reported at the instance of the Austen Coke Company:
(1) The amount paid out by Shaffer for permanent improvements or building new ovens........:................ $6,215 61
(2) Amount applied of the profits of the mines and sale of coke to the payment of Martin L. Shaffer's debt.. $1,047 50
(3) Amount paid to miners, laborers, etc., assigned to Martin L. Shaffer, and paid by him out of the mines and coke...................................................... $2,814 43"

There was no exception filed to this report by Samuel Colgate, but the court in acting upon it ordered, that this cause be recommitted to the commissioner, who shall ascertain

and report certain specified things; also the amount in the hands of the said Martin L. Shaffer as agent and manager of the Austen Coke Company; that he also report any property of said Hurd besides said leasehold estate, upon which the various judgments and attachments against said Hurd are liens, and the priorities thereof, and any other matter deemed pertinent or required by any of the parties. The commissioner on March 9, 1886, made his report, in which he said:

"No evidence was produced before your commissioner in reference to Samuel Colgate's royalty, upon which to base a report." He reports all the evidence, on which his former report was based, to the court, and states: "No oral testimony was taken before me," and he sends up and refers to all the written testimony, on which his last report is based. The depositions of Jessup and Shaffer, before referred to, were sent up with this report.

Samuel Colgate did not except, on account of the failure to report the amount of royalty due him under his lease of the Austen mines property to said Hurd, as specially required by the order of reference. I can not conclude, that this failure to except can be regarded as an abandonment by Samuel Colgate of his claim to royalty. This simple failure to report the amount due on this royalty reserved can not be regarded as the equivalent of a report that nothing was due thereof. If this had been the report on this order, and it had not been excepted to by Samuel Colgate, it would have been properly held as acquiesced in by him, and his claim of royalty would have been regarded as abandoned. But as there was no such report against this claim set up in Colgate's answer and proved satisfactorily to exist, the court ought to have recommitted the cause to the commissioner and required him to report the amount of this claim; or it should from the evidence in the cause have ascertained, as it easily could, the amount of this claim and decreed it to be paid first out of the funds, which had been paid into the court by Shaffer.

If Jeffreys has not a claim to this fund by reason of his attachment, his claims by reason of his having filed a cross-bill in the nature of a foreign attachment it can not be sus-

tained. This fund was paid into the court on November 20, 1885, and the attachment on this cross-bill filed by Jeffreys did not issue for some time thereafter,—that is, on the 30th of June, 1886,—so that these funds being unquestionably in the hands of the court were not subject to an attachment by Jeffreys.

This suit cannot justly be regarded simply as a suit to foreclose a mortgage. The parties, as well as the court below, always evidently regarded it as embracing much more than a simple foreclosure of a mortgage. This is shown by the fact, that Shaffer, the mortgagee, was an agent of the mortgageor and was made a party to the cause, which ought not to have been done, had the suit been simply to foreclose a mortgage. He was obviously made a party defendant in order to make him account for the funds of the mortgageor, which he had received as the manager of the mortgaged premises. All the lien-creditors of every description were made defendants. This would obviously have been improper, if it had been a suit simply to foreclose a mortgage. See *Mooreland* v. *Metz*, 24 W. Va. 119. The court by a consent decree, referred the cause to a commissioner to ascertain all the property of the mortgageor, real and personal, and all the liens on it and their respective priorities; and this was accordingly done. This shows, that no one in the court below regarded this a suit simply to foreclose a mortgage; and yet this is insisted on as the character of this suit.

That the court below should have ascertained the true amount of royalty due to Colgate under his lease and directed its payment out of the fund in the hands of the receiver, which was paid into court by Shaffer and was derived from the mining of coal on said leased premises, was a sequence from the course it did pursue. It set aside the sale of the mortgaged premises at $5,000.00 on an upset bid of $5,500.00 and ordered a re-sale. These premises were a lease for five years, which was of course diminishing in value rapidly every year, as the purchaser could by his purchase obtain the premises only till the termination of the lease. But the court and its officers were so dilatory in the making of this re-sale that the lease expired before it was made. Of course the mortgage then was obviously of no value, and the

parties, who had offered the $5,500.00 as an upset bid to the court, refused to make this or any other bid; and the court instead of holding them to their bid by its final decree of November 16, 1881, discharged them from any liability thereon. This would seem to be but just to them : and if, as we hold, the net rents, issues and profits of the leasehold premises paid into court by Shaffer were to be distributed as the proceeds of he lease, if sold, would have been, then no one will sustain any loss from this failure of the court to have this leasehold property sold; for though it was worth $5,500.00, yet those entitled to the money, it would have sold for, according to our views will get in lieu of its salable value the net profits from the use of said leasehold premises up to the termination of the lease. If however they are entitled, as the appellants insist, to no part of these net profits in the hands of the court, then they have suffered a loss of $5,500.00 by reason of the court's failure to re-sell the property promptly, and the release of those, who offered the upset bid, from all liability therefor.

'The counsel for the mortgagees insists that the parties, who offered this upset bid of $5,500.00, ought, though the lease had expired before the re-sale, to be required to pay this sum. If this had been simply a bill to foreclose this mortgage, there might have been much reason in this view. If this $5,500.00 was to be a clear loss, it would seem more just, that it should fall on those, who had produced it by making the upset bid, rather than on the mortgageors; but if, as we think, the net rents and profits of this lease can be substituted in effect in this case for the lease, then there would be no such clear loss of $5,500.00 and no necessity to impose it on the parties, who had offered this upset bid.

One of the appellees, Ulman, by his counsel complains of errors against him in the court below. To understand his complaint it is necessary to state briefly his connection with the matters in controversy in this suit, as shown by the record. Commissioner Dent in one of his reports makes an accurate statement of a portion of these facts thus :

"For the assistance of the court your commissioner gives the following history of certain matters connected with the case : Some time in the year of 1874, Sinsheimer, Joseph

Rittenberg, and S. L. Adler were the owners of the furnace property known as the 'Lancaster Furnace Property,' and were running said furnace, and, being in need of funds, they borrowed of Joseph Ruck fifty thousand dollars, and executed a deed of trust on said land to Isador Raynor, trustee, to secure said sum of money. After the execution of said trust-deed the Lancaster Furnace & Mining Company was incorporated, and said land conveyed by said Sinsheimer, Adler, and Rittenberg to said company, subject to said trust-deed; and afterwards, on December 21, 1874, said Lancaster Furnace & Mining Company executed a second deed of trust on said real estate, and all their personal property situated on said premises, to Jacob Krauss, to secure certain notes executed by said furnace company for the sum of $44,800.00. Said Krauss, the trustee, became the owner of said notes, and took possession of said furnace, and ran the same for ninety days. Said indebtedness of said furnace company to said Krauss seems to have been reduced to $15,000.00. Said company was largely indebted to the men employed about said works, and it executed another deed of trust to Samuel Fernheim to secure said employes. Said employes assigned their claim to George Heller, who instituted a suit in chancery, and levied an attachment on all of said property. Said Heller obtained judgment against said company in the Circuit Court of Taylor county in said chancery suit, but the court failed to ascertain and settle the priorities on said property, and reserved its decision upon all questions in relation to said property, but gave Heller leave to sue out execution, which he did, and levied upon all the personal property. Jacob Krauss filed his answer in said suit, praying an injunction to said execution, which was granted. Said injunction was never perpetuated, and said chancery suit was continued from time to time, and in 1879 was dismissed, (all parties being tired.) In the mean time Isador Raynor, trustee in the first trust-deed, sold said real estate to Alfred J. Ulman, and Ulman took possession, the personal property still being on said premises; and Raynor's trust-deed did not cover the land upon which the railroad was situated, hereinbefore reported as the Lancaster Furnace & Mining Company, because said property was acquired by said company

after the making of said deed. Neither is the said strip of land included in the Krauss deed of trust. · Said Krauss deed of trust was never executed, and Krauss took possession of said property, and treated it as his own. He subsequently left said premises, and removed out of the state. He afterwards sold his interest in said property to Charles S. Hurd, who leased the land of Ulman, and took possession of the personal property, and ran the furnace until the fall of 1880, when he suspended operations. In the mean time he had charged said property with the liens hereinbefore reported, except the execution liens, which were acquired by after-recovered judgments. On July 1, 1878, Ulman leased this Lancaster furnace tract so purchased of the trustee Raynor, and the Holland tract adjoining it, to C. S. Hurd for one year. This lease was afterwards extended to January 1, 1884, and Hurd gave mortgages on this furnace-property sought to be foreclosed in this suit."

This statement will suffice to enable us to understand the counter-assignment of error made by the council for Alfred L. Ulman, one of the appellees. It is as follows: "Alfred L. Ulman, one of the appellees, by way of counter-assignment of error against him in said decree, suggests and relies upon the follows: He is the owner of the tract of land upon which said furnace was built, having bought it at the trustee's sale. About onethird of said tram railway is located on appellee's land. Of the other twothirds, one is upon the Armstrong land, and the other upon the Rosset land. Said tram railway was built for the use of the furnace, and is as much a part of the furnace as any other machinery, and is therefore real estate,—a fixture,—and was bought by appellee with the furnace at the trustee's sale. *Second.* The property at the furnace sold by Constable Blue, under the distress in favor of this appellee, was the property of Hurd, and subject to the warrant. It was error to require the proceeds of this sale to be paid to Browning."

It is true, that Krauss had a lien upon this property, before Ulman leased it to Hurd; but Hurd bought Krauss's lien and afterwards sold or assigned it to Browning. Now, if the property were still in the hands of Hurd, it is plain, that Ul-

man .would have a lien for his rent, and Hurd could not de-
feat this lien by selling the property then on the lessor's
premises without providing for at least one year's rent. Code
c. 93, s. 12.  The facts stated in these assignments of error
are supported by the evidence in the record.  The deposition
of Charles E. Hooper, a deputy-sheriff of Taylor county, also
proves, that he had in his hands an execution in favor of
George Heller against the Lancaster Furnace & Mining Com-
pany dated January 4, 1881, for $3,684.36 with interest from
1875 and $45.55 costs; that he levied this execution on two
and a half or three miles of railroad iron and some other
personal property belonging to the Waldorf furnace, which
C. S. Hurd had been running in part on said land leased by
said Ulman to said Hurd.  On June 20, 1881, this deputy-
sheriff under this execution sold this railroad iron to John
W. Mason and John S. Herr for $1,850.00.  This railroad
iron was levied on as the personal property of the Lancaster
Furnace & Mining Company under the order of said Mason,
its attorney, to whom the net proceeds of the sale was paid.
The court below was of opinion and decided, that the rail-
road, so far as it was on said lease land, was included in the
mortgage executed by said Hurd to E. S. Browning, and the
proceeds of it should have been paid to him as the party hav-
ing the first lien thereon, and that it had been erroneously
regarded by the deputy-sheriff as the property of the Lancas-
ter Furnace & Mining Company; and it was accordingly de-
creed, that said Heller do pay to E. S. Browning the net
proceeds of the sale of the railroad iron, which had been so
paid to him by said deputy-sheriff in extinguishment to that
extent of said Browning's claim on said Hurd secured by
said mortgage.

The propriety of this decision by the court below is called
in question by these counter-assignments of errors.  Brown-
ing claims under an assignment to him by Hurd of a mort-
gage, which had been assigned to Hurd by one Krauss.  This
mortgage was dated December 22, 1874, and was executed
by the Lancaster Furnace & Mining Company to Krauss to
secure a loan, and it was upon the land, on which said com-
pany had built in part said railroad; and on the 15th of May,
1879, said Hurd had conveyed certain personal property and

the railroad iron on said railroad running from said furnace to Ironton by a mortgage to secure a debt. If this iron on this railroad be regarded, as the counsel for Ulman in this counter-assignment of error insists it should be regarded, as real estate, then Ulman became the owner of it, when the trustee, Raynor, conveyed this furnace-tract of land, on March 11, 1876. But he leased this land and railroad to said Hurd till January 15, 1884, and Hurd gave a mortgage on said railroad to said Browning, and in addition thereto said Hurd assigned another mortgage on said furnace-tract, which would include the railroad iron given by the Lancaster Mining Company to said Browning. It would seem therefore, that, if this said railroad track be regarded as real estate, as Ulman's counsel claims, he has no claim to the proceeds of the sale of this railroad track on this furnace-tract, as it had by mortgages passed to said Browning; and the Circuit Court properly held, that he (Browning) was entitled to the proceeds, so far as they were on this furnace-tract but no further, and ordered their payment to him. There is therefore no foundation for the first counter-assignment of error by said Ulman.

Nor is the second assignment of error well founded. The constable, Blue, sold under execution in November, 1881, various articles of personal property used in connection with this furnace-property, which were fixtures, which had with this property been mortgaged by Hurd to secure a debt to said Browning. This personal property included in said mortgage fixtures, which were sold for $678.15, and the money was brought into court by said Blue, to be disposed of by the court in this suit by directing its payment to the party entitled to it. The proceeds of said sale were directed by the court to be paid to said Browning. It was clear, that the claim of Browning by reason of his mortgage was prior and superior to that of the execution-creditors. But said Ulman gave the constable notice, that he had a claim for $750.00 for rents due from said Hurd on August 15, 1881; and the record shows, that there was that much more due from Hurd to Ulman for three months' rent of this furnace property. This rent was due under a lease dated February 1, 1878.

The oldest mortgage held by said Browning on Lancaster Furnace property and fixtures was the one to Jacob Krauss, dated December 23, 1874, afterwards assigned to said Hurd, and then assigned to said Browning. This mortgage was on the fixtures sold by the constable, and, if it had been a lien created after the commencement of Ulman's lease, then by section 12, c. 93, Code W. Va. 1887, Ulman would be entitled to claim as against such lienor as much as one year's rent; but, as the lien existed when the tenantry of said Hurd to Ulman commenced, this statute has no operation in this case, and the mortgage in favor of Krauss now belonging to said Browning has the first claim to the proceeds of the sale made by Blue, constable; and the court below did not err in directing the proceeds to be paid to said Browning.

George Heller, another appellee, as a counter-assignment of error complains, that the court below erred in this portion of its decree of November 16, 1887: "And it appears to the court, that the defendant George Heller, on the 20th day of June, 1881, received from George E. Hooper, deputy-sheriff, upon an execution issued by the said Heller, and levied upon certain railroad iron, and a certain locomotive engine, tender, carts, wagon, and saw-mill engine, which was sold by said sheriff under said execution as the property of the Lancaster Furnace & Mining Company, the net sum of $1,707.14; and it appearing to the court that none of said property was the property of said company, or liable to said execution, but that the same was included in the same mortgage executed by Charles S. Hurd to Edward S. Browning, and that the said claim herein before decreed to said Browning constituted a lien upon all of said property first in order of priority,—it is therefore adjudged, ordered, and decreed that said George Heller do pay to said Edward S. Browning said sum of $1,707.14, with interest thereon from said June 20, 1881, to this day, now amounting to $2,363.25, with interest of this sum $2,363.25 from this day, in extinguishment to that extent of said Browning's claim against said Hurd; but this decree is made without prejudice as to any other remedy of said Browning, at law or in equity, to collect said $2,363.25 in any other way, or from any other person, if any such remedy he has."

The following are the views of the counsel for said Hurd on this point:

"*First.* Said railroad is real estate, and therefore not subject to Browning's claim. *Wright* v. *Ore Co.*, 45 Pa. St. 475. Appellee has the oldest judgment against said mining company, and his judgment is a lien upon said strip of ground belonging to said company, bought by it from Samuel Armstrong, and upon which about one third of said railroad track lies. The Armstrong land was not included in any of the mortgages made by the company. *Second.* If said railroad shall be held to be personal estate, then Heller's execution was a lien upon it. This lien was sold under said execution, and the Circuit Court decreed, that Browning was entitled to proceeds. It will be observed that on the 22d day of December, 1874, the company executed a mortgage on all its personal property to secure a debt to Jacob Kraus; that Kraus assigned his claim to Hurd, and Hurd assigned his to Browning. There was never a foreclosure of this mortgage. Heller obtained a judgment against the company, and took out execution. This execution was levied on the railroad, among other things, and the iron was sold as the property of the company. The execution, it is true, was issued long after the mortgage was made and assigned. But it is maintained that the mortgage was never properly admitted to record, and therefore was void as to Heller, who is a *bona fide* creditor of the company. It is suggested that the mortgage was not properly acknowledged, and could not be legally admitted to record. The mortgage is signed by L. Sinsheimer, and acknowledged by Frank P. Clark. It is submitted that it could only be legally acknowledged by the person who executed it."

The said railroad track is properly speaking to be regarded as real estate, and, so far as this record shows, George Heller has the oldest unsatisfied judgment against the Lancaster Furnace & Mining Company. A portion of the land, on which the railroad was built, was not included in any of the mortgages on this furnace-tract of land, and the proceeds of as much of this iron, as was on this Armstrong land, ought not to have been ordered by the Court to be paid to Edward S. Browning, but this much of the fund, which had

been paid by the deputy-sheriff, Hooper, to said Heller on his execution against the Lancaster Furnace & Mining Company, ought to have been allowed to remain there as property on his land and belonging to him; but, as we have said before, as the residue of this railroad track was included in the mortgages of Edward S. Browning, the proceeds of this portion of the track in the hands of said Heller ought to be decreed to be paid by him to said Browning. The record does not at present enable us to determine what portion of said railroad track was on Armstrong's land,—whether it was one third, as was claimed, or more or less than that portion. This must be ascertained, before it can be decided, what disposition should be made of the proceeds of the sale of this railroad iron.

It is claimed however, that one of these mortgages on this Lancaster furnace property and fixtures now owned by Edward S. Browning (the one of December 22, 1874,) is not a valid lien, because not properly recorded. The defect in its recordation is, that, while it was signed by Sinsheimer, president of the Lancaster Furnace & Mining Company, the mortgageor, and the corporation seal affixed by him, yet it was acknowledged by Frank P. Clark. It is claimed, that the corporation seal being attached to the deed of mortgage by the president, he was the proper and only person who could acknowledge this mortgage for recordation; whereas in this state no statutory provision exists as to the execution or acknowledgment of a deed by a corporation. The officer, who affixes the corporation-seal, is the party executing the deed, within the meaning of the statute requiring its acknowledgment by the grantor. See *Kelly* v. *Calhoun*, 95 U. S. 710. But though not acknowledged by the president, who signed the deed, it seems to me, that it was properly acknowledged, because on its face was this provision : "And this deed further witnesseth, that the said Lancaster Furnace & Mining Company doth hereby appoint Frank P. Clark its attorney in fact to acknowledge these presents to be the act and deed of said company, to the end that the same may be properly recorded." Frank P. Clark, the certificate of a commissioner for West Virginia in Maryland acknowledged the said writing to be the act and deed of said

company. This, it seems to me, was an acknowledgment by the grantor, who, if a corporation, must act by some agent appointed to acknowledge the deed for recordation, had the corporation not expressly appointed some one else to acknowledge the deed for recordation. See *Talbert* v. *Stewart*, 39 Cal. 602; *Biglow* v. *Livingston*, 28 Minn. 57; 9 N. W. Rep. 31.

Martin L. Shaffer, another one of the appellees, makes a counter-assignment of error : "Appellee had no interest in the case of *Childs* v. *Hurd* and others, when the same was brought, and was only made a party because he then had the possession and custody of the property leased by Colgate to Hurd; and but for this suit the appellee Shaffer would have returned the property to Hurd or his assignee as soon as the object, for which he took it, had been accomplished, but was advised that he was by the said bill made the receiver, or was treated as such for the time being, and as such should let the property remain *in statu quo*, working as he had done. The leased premises remained in his custody until the expiration of said lease. *First.* It was error to charge appellee Shaffer with interest on the amount in his hands from the 1st day of May, 1883, because the amount was not a debt due from him, nor was it damages for a wrong committed by him. It was the proceeds of the leased premises which had accrued in his hands during the progress of the suit, which was at all times subject to the order of the court in the cause."

This counter-assignment of error cannot be sustained. It might perhaps in some other state, but in Virginia and West Virginia the law seems to be settled, that in such a case interest should be paid, because the money is worth the interest, and the creditor is entitled to the interest, and it is presumed, that the money was used by the party holding it. If he was unwilling to pay interest on it, he could at any time have avoided and stopped the payment of interest by paying the fund into court, when it would have been ordered to be loaned, if the court could not determine to whom it was properly payable. See *Tazewell's Ex'r* v. *Barrett*, 4 Hen. & M. 263; *Templeman* v. *Fauntleroy*, 3 Rand. (Va.) 446.

The appellee Mary E. Clerc also files a counter-assignment

of error. It is as follows: "The appellee Mary E. Clerc, wife of F. Leon Clerc, by way of counter-assignment of error in the decree made in this cause on the 16th day of November, 1887, says she is prejudiced by said decree, and that she is informed that the same is erroneous, for the following reasons, to-wit: In decreeing that portion of the iron tram railway lying on the Rosset land to be subject to the mortgage executed by the Lancaster Furnace & Mining Company in favor of Edward Browning. On the 3d day of July, 1874, John D. Rosset leased a large tract of land to said company for the purpose of mining and removing iron ore. Said lease provided, among other things, that said company 'shall have the right and privilege of removing from said lands all railroad machinery and fixtures placed thereon by it, provided all the rent and royalty due under the contract be paid. But it shall at no time remove anything so placed thereon when there remains due any royalty.' This property, as will be seen by the record, afterwards became the property of F. Leon Clerc. The said company put down the railroad track, and used it a year or so, and then failed; being at the time of the failure largely indebted to Rosset. There would seem no reasons why the conditions of this should not be observed. The railroad iron is not worth anything like the sum the company owed Rosset when it abandoned the lease."

The facts stated by the council of the appellee above are true, as appears from an examination of the record. The proof is that the Lancaster Furnace & Mining Company, when they failed, owed for royalty on this Rosset land more than $1,000.00. The Rossets and those claiming under them took possession of this land when said company broke up and abandoned it. On November 19, 1887, F. Leon Clerc, who then owned this Rosset land, leased it to said C. S. Hurd for the purpose of working the iron ore on said land for a certain royalty. If, as the lease of 1874 provides, the lessee, the Lancaster Furnace & Mining Company, had no right to remove the iron ore, till all royalty due on the land was first paid, it would seem clear, that they could not confer such right on others either by sale or mortgage; and the right of every assignee, or person claiming under the Lancaster Furnace & Mining Company to the iron on the railroad must yield to

the claim for the satisfaction out of it first of the unpaid royalty on the leased land.

The counter-assignment of error in this respect, by the executrix of F. Leon Clerc, must be sustained as well founded.

For the reasons above given, the decree must be reversed with costs to the appellants against the appellees other than Childs & Brown, Edward F. Browning, John Hull Browning and Mary E. Clerc, executrix of F. Leon Clerc, and the cause is remanded for further proceedings to be had according to the principles stated in the opinion.

REVERSED.   REMANDED.